138 N.J. Super. 1 (1975)
350 A.2d 102
PHILIP KRUVANT, CHARLES KRUVANT AND BOBCAR CORPORATION, A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFFS,
v.
12-22 WOODLAND AVENUE CORPORATION t/a SUBURBAN ESSEX RIDING CLUB, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided November 26, 1975.
*6 Mr. William L. Brach, attorney for plaintiffs (Messrs. Brach, Eichler, Rosenberg & Silver, attorneys).
Mr. Sheppard A. Guryan, attorney for defendant 12-22 Woodland Avenue Corporation (Messrs. Lasser, Lasser, Sarokin and Hochman, attorneys).
Mr. Charles E. Villanueva, attorney for defendant Mayfair Farms Holding Corp.
DWYER, J.S.C.
While sipping a drink and chatting with an attorney at a party about plans to develop what is labeled as Lot 1445-B in Block 152-X on the tax maps of Town of West Orange (Lot B), one of the owners was startled to hear the attorney tell him that those who had been riding horses across Lot B from the nearby stable might have acquired an easement across it because the activity had been going on for as long as the attorney could remember. *7 Shortly thereafter the owners of Lot B demanded for the first time that the stable either pay rent or stop using Lot B. The stable refused both demands. The owners then commenced this action.
By conveyance from Empire Holding Co. (Empire) to plaintiffs Philip Kruvant, Charles Kruvant and Bobcar Corporation the latter are the record owners of Lot 1445-B in Block 152-X on the tax maps of Town of West Orange Lot B containing 10 ± acres. 12-22 Woodland Avenue Corporation, trading as Suburban Essex Riding Club (club) operates boarding stable for approximately 100 horses, and a riding academy on premises which the club owns on the north side of Nicholas Avenue, a paper street, and which premises face Lot B located on the opposite, or south, side of Nicholas Avenue.
The matters at issue are: (1) the right of plaintiffs to terminate the club's use of the bridle trail which extends approximately 800 feet diagonally across Lot B to an oversize culvert constructed in 1939 by Essex County to permit horses to pass from that bridle trail under Prospect Street and into Eagle Rock Reservation (Reservation) where there are several miles of bridle trails, the right to terminate the club's use of certain other areas of Lot B, and the right of plaintiffs to collect money damages from 1973 based on use and occupancy, and (2) the right of the club, asserted by counterclaim, to have the court declare that it has either title to said bridle trail and said certain other areas under the doctrine of adverse possession, or a prescriptive easement for the bridle trail and those other areas. Depending upon the resolution of the main question, there is a related question of whether plaintiffs have a cause of action against Mayfair Farms Holding Corporation (Mayfair) for breach of Mayfair's full warranty deed executed and delivered to Empire on December 30, 1955, because of the club's rights in the bridle trail and said certain other areas in Lot B.
Although a predecessor in title of the club established a riding stable on the club's premises in 1927 and utilized *8 both the lands now in Lot B as well as Woodland Avenue, a paved public street which runs parallel to Nicholas Avenue, as a means of travel to reach Prospect Street where the riders crossed into the Reservation, the court finds that the critical point of inquiry begins after 1939.
The subject premises is part of a large block bounded on the north by Nicholas Avenue, on the east by Prospect Street, on the south by Eagle Rock Avenue, and on the west by Terrace Avenue. The same streets existed in 1939. In 1939 Lot B consisted of one tract and a portion of another, i.e., the Mateer tract and a portion of the Lanzer tract. The Mateer tract embraced all the frontage on Nicholas Avenue between Terrace Avenue and Prospect Street, and had a depth, or frontage, on those streets of 200 feet and 152 feet, respectively. Except for some lots and homes fronting on Terrace Avenue and several other acres in the center of the block connected to Eagle Rock Avenue by a 50-foot strip owned by a corporation related to Mayfair, the Lanzer tract included the remainder of the block which was then wooded, unenclosed and undeveloped. The subject bridle trail starts on the north side of Nicholas Avenue, crosses that street, enters Lot B and runs 800 feet diagonally across Lot B to the culvert which is about 330 feet south of the intersection of Nicholas Avenue and Prospect Street. The bridle trail crosses the Mateer tract and the portion of the Lanzer tract now forming part of Lot B.
Plaintiffs proved their deed and the use by the club. Frank M. Cummins, Assistant County Engineer for Essex County, who holds a B.S. degree in Civil Engineering, a master's degree in Civil Engineering and is a licensed professional engineer, was called at trial by the club to testify about the culvert under Prospect Street through which the bridle trail is connected to the Reservation. He testified that, based on the engineering data in the files of the county engineer, before the culvert was reconstructed in 1939 it could carry storm water and the water of a stream from the Reservation to a stream bed in Lot B on the other side of *9 Prospect Street, but it was not large enough to accommodate a horse. Subsequent to the construction of the present culvert a horse and mounted rider could pass through it.
During the adjournment overnight he rechecked the files of the office of the county engineer and discovered some correspondence between a Mr. Girdler and the county engineer in 1939, as well as a copy of an unsigned two-year license agreement between the club and Marion Lanzer for use of the bridle trail across the portion of present Lot B that was then part of the Lanzer tract. The form of agreement and correspondence were admitted into evidence for the purpose of showing that the club negotiated with Lanzer in 1939, but not for the purpose of establishing that permission was granted.
The court was subsequently informed by counsel that the law firm which represented Lanzer no longer had any file on the matter. Through the testimony of a witness called by plaintiffs on rebuttal, Leroy DuBois, one of three brothers who started the riding stable in 1927, it was established that Girdler was a relatively wealthy individual whose children boarded horses at the riding stable in the 1930s. He became concerned about the safety of the riders crossing Prospect Street on horseback as automobile traffic developed in the 1930s. DuBois brothers had attended to the business affairs of the stable and he to the horses and riders. He stated the corporate records and business records no longer exist. He said that he recalled that Girdler undertook to negotiate with the county concerning the culvert for the riding stable and those who rented and boarded horses there.
The minutes of the board of freeholders regarding the culvert project reflect that there was inquiry about the right of the riding stable to use the bridle trail on the other side. From the records introduced into evidence there is no definite answer as to what right the riding stable had in 1939 to use the bridle trail on the Lanzer tract in 1939. The court finds that, in respect to Lanzer, the riding stable, predecessor *10 in title of the club, recognized the paramount rights of Lanzer in 1939 by Girdler negotiations.
DuBois also testified that he recalled a dispute about the riders crossing the Mateer tract before the tract was sold. Although he was not personally involved in the matter, he recalled that it was settled by his brothers, or the riding stable, making a payment of money. He believed that the Mateers wanted them to buy the land but did not have the money. Although DuBois is now in his 80s and his memory weakened by passage of time and advancing age, the court found him a credible witness and finds that this sort of event is of the type that would have been discussed among the owner brothers and particularly with DuBois who lived, and lives, in a home adjoining the club. The court finds that the riding stable did recognize the paramount rights of the Mateers when it made the payment.
Based on the foregoing findings, the riding stable, in or about 1939, but in any event prior to the conveyances by Lanzer and Mateer, recognized the paramount rights of Lanzer and Mateer in what is now Lot B. In light of the inquiry made by the officials of Essex County of Girdler about the rights of riding stable to use the opposite lands for a bridle trail to the proposed culvert before authorizing the project, as well as the correspondence of Girdler in response to that inquiry and the payment to Mateer, the court finds that the riding stable obtained permission to use said lands for a bridle trail in the period between 1939 and the respective dates of the subsequent Lanzer and Mateer conveyances.
By deed dated October 28, 1944 the Lanzer tract, which comprised basically the whole of the block with the exceptions noted above, was conveyed to Mayfair. By deed dated November 1, 1945 the Mateer tract was conveyed to Mayfair.
The critical date for the start of inquiry into the rights of the respective parties to this action is November 1, 1945, the date of the conveyance of the land across which the portion of the bridle trail closest to Nicholas Avenue crossed.
*11 The activities of riding stable in making payment to Mateer and obtaining a license from Lanzer may be considered as evidence of permission and a break in the continuity of any previous period of adverse use. See Kiernan v. Kara, 7 N.J. Super. 600 (Ch. Div. 1950); Penna. R.R. Co. v. Hulse, 59 N.J.L. 54 (Sup. Ct. 1896); Soper v. Conly, 108 N.J. Eq. 370 (Ch. 1929), aff'd 107 N.J. Eq. 537 (E. & A. 1931); Strong v. Baldwin, 137 Cal. 432, 70 P. 288 (Sup. Ct. 1902) (payment for use broke continuity of adverse use). Compare Kana v. Bolton, 36 N.J. Eq. 21 (Ch. 1882); 3 Powell, Real Property, "Easement by Prescription."
However, a person who is using property by permission may become an adverse user by subsequent events where the servient estate is conveyed away. Feldman v. Knapp, 196 Or. 453, 250 P.2d 92 (Sup. Ct. 1952); First Nat'l Bank v. Vanden Brooks, 204 Mich. 164, 169 N.W. 920 (Sup. Ct. 1918) (conveyance of land ended consensual agreement for use of stairway, so that defendant from date of conveyance was an adverse user); Toney v. Knapp, 142 Mich. 652, 106 N.W. 552 (Sup. Ct. 1906) (written personal license for use of 20 feet of 91-acre tract for private roadway was terminated by user's conveyance of land and subsequent use of roadway was adverse); Foley v. Lyons, 85 R.I. 86, 125 A.2d 247 (Sup. Ct. 1956) (conveyance of servient estate terminated oral license, and use thereafter was adverse); Fine v. Straus, 86 Ga. App. 354, 71 S.E.2d 580 (Ct. App. 1952) (conveyance of servient estate terminated permissive use, and use thereafter, being by acquiescence, ripened into prescriptive easement).
In Feldman v. Knapp, supra, plaintiff sought (1) an injunction against defendant's interference with plaintiff's use of a driveway which started at a public street, crossed defendant's property and then entered plaintiff's property, and (2) a declaration of right that plaintiff had a permanent easement. The record established that plaintiff's predecessor in title had divided the tract into two lots under separate *12 ownership prior to construction of the driveway and separate homes on each lot. After construction of the driveway, the common predecessor in title reacquired the second lot and mortgaged it. In lieu of foreclosure the common predecessor conveyed title for the second lot to the mortgagee without reservation of an easement for the driveway.
In 1944 the common predecessor conveyed the other tract to plaintiff's precedessor in title by warranty deed. The record established that plaintiff's predecessor in title had used the driveway openly, continuously and exclusively ever since 1933. The applicable statutory period was ten years.
The court concluded that no permission was requested or given after 1933. It said:
Under the facts and circumstances of this case a presumption arose that the user by plaintiffs and their predecessors in interest of this driveway was adverse and under a claim of right. There is no evidence in the record to rebut that presumption. The burden of proof was upon defendants to rebut the same if, in fact, it could be rebutted. Evidence of mere acquiescence in, as distinguished from permission for, such use on the part of the owners of the servient estate is insufficient for the purpose. In Shephard v. Gilbert, 212 Wis. 1, 249 N.W. 54, 58, the court said:
"* * * It is our conclusion that neither friendship nor close social relations of the owner and initial user can be effective to rebut the presumption. Such evidence may indicate acquiescence, but it plainly falls short of proving a permission acted upon by Smith. Mere acquiescence at the commencement of a use would not affect its adverse character." [Italics supplied]
In 17 Am. Jur., Easements, 976, § 65, the rule is stated:
`The foundation of the establishment of a right by prescription is the acquiescence on the part of the owner of the servient tenement in the acts which are relied upon to establish the easement by prescription. This makes it necessary that he know of those acts, or be charged with knowledge of them if he did not in fact know of them. * * * It is presumed, however, that every man knows the condition and status of his land; and if anyone enters into open and notorious possession of an easement therein under claim of right, the owner is charged with knowledge thereof." [196 Or. at 472, 250 P.2d at 101-102].
The court affirmed relief for plaintiff.
These decisions are consistent with the law of New Jersey. Kiernan v. Kara, supra, and East Jersey Iron Co. v. *13 Wright, 32 N.J. Eq. 248 (Ch. 1880); Page v. Gaskill, 84 N.J.L. 615 (E. & A. 1913).
The main question for resolution is what was the nature of the use and the relationship between the riding stable, the intermediate owner and the club as user of the bridle trail, and the series of owners of what is now Lot B after November 1, 1945 and until the commencement of this action on July 11, 1973.
Mrs. Mayrl Walker testified for Club. She has been riding at the club since 1934 and has boarded a horse there since 1936 when the operation was known as the Montclair Riding Club. Prior to the enlargement of the culvert riders rode their horses up Woodland Avenue and crossed Prospect Street into the Reservation, or rode across the bridle trail to the stream and crossed Prospect Street at grade level into the Reservation. The bridle trail has always been in its present location except for some regrading to permit horses to reach the lower level to enter the enlarged culvert.
She identified a meadow in a photograph as a schooling path. Other witnesses referred to it as a dressage field. It is located near Prospect Street in an area close to the slope of the bridle trail to the culvert. She said that the riders had used this area probably longer than the bridle trail. She did not recall whether the meadow area had been wooded and cleared by bulldozers by plaintiffs after they acquired Lot B.
She testified that no one ever interrupted use of the bridle trail. No one ever posted any signs denying use. She testified that she never heard that anyone had ever given permission to use the lands across Nicholas Avenue. She assumed that she had permission, or that the club and its predecessors did.
Other witnesses with many years of association with the club and its predecessors testified that, subject to severe weather when the bridle trail is not used, riders use the bridle trail every day to go to the Reservation. They testified that the bridle trail is the only route to the Reservation. *14 They testified to the dangers of riding horses on a hard surface such as paved Woodland Avenue and the dangers of crossing Prospect Street at grade.
James Allen, the present stable manager, testified that he started working at the club at eight years of age when his father was the stable manager. He is now 44. He testified that as a youngster he had walked horses in the meadow or schooling area. He did not know that anyone had ever interrupted use of the bridle trail. He further testified that he recalled the schooling area as a berry patch where he exercised horses. Other youngsters did, and still do, exercise horses in the meadow. He did not recall anyone bulldozing that area. In 1959 he was away from the club premises, driving a tractor trailer for a period of several months.
Martin L. Horn, Jr., was called by plaintiffs as a rebuttal witness and testified that he, his brother and his father are the principals in Mayfair. He further testified that between 1939 and 1943 he had ridden at the Montclair Riding Club, a predecessor of the club, over the bridle trail and through the culvert. After returning from military service he had ridden occasionally with a friend over the bridle trail and through the culvert while Mayfair owned what is now Lot B. He had attended school with the DuBois children.
He did not know whether Mayfair had ever given permission to predecessors of the club to use land, for he was a student at that time. He knew of no objection made by Mayfair. He knew of no damage done by the riders or horses, but he said that the land was then undeveloped.
DuBois confirmed Horn's testimony. He also testified that Donald Horn, a younger brother of Martin, had also ridden at the riding stable. DuBois knew Martin L. Horn, Sr., because he ran the restaurants at the corner. DuBois would see him occasionally at the restaurants, and he recalled that the father had on occasion come to the riding stable to see the sons ride.
DuBois could not recall that anyone ever asked Martin L. Horn, Sr., for permission, or was given permission, to use the bridle trail.
*15 A year prior to trial DuBois had signed a written statement, prepared by an investigator for plaintiffs, which contained the following statement: "We never had anything in writing but it was always agreed that we could use this property." In response to a question by counsel for plaintiff as to whether the statement was true, DuBois answered: "Well, I thought it was then but I'm afraid it wasn't the truth."
The record does not contain any inference that anyone tried to influence DuBois to change his testimony. The court finds that DuBois was endeavoring to be honest in his answers, wanted to be cooperative with everyone, and had no understanding of the legal principles of adverse possession. The court concludes that the answer given at trial was correct; further, that the reason he changed his position was that the questioning about permission to use the land made him aware of the fact that no one had given permission except in the Lanzer and Mateer episodes previously referred to.
DuBois also testified that the lands near the culvert had not been used for an assemblage area or a schooling area. There was brush in that area as well as grade. At least that was the condition until the conveyance of the club premises, with which he was associated about 17 years ago, to the immediate predecessor in title to the club.
There is no evidence that after 1939 any person other than those riding from the club's stables used the trail. It was used on a daily basis except for extreme weather.
Although there is some testimony that after 1939 children may have ridden horses on portions of Lot B other than the bridle trail and the meadow or schooling area, the court finds that after 1939 riding was confined to the bridle trail and in the late 1950s riding began in the meadow or dressage field. Weighing the interests of the witnesses, their recollections and their credibility, the court finds that plaintiffs did bulldoze the area in the late 1950s and riding commenced then. The court finds that after 1939 there was no indiscriminate riding in the area beyond the block upon which *16 Lot B is located. The court further finds that, according to the exhibits and testimony, riding beyond Lot B in the block in which it is located was not possible after 1955 because of commercial development, first in the form of a golf driving range and later as a shopping center to the south. Further, the exhibits indicate that the stream running from the culvert creates a natural barrier to persons riding horses south of Lot B because of grade differences. Across Woodland Avenue on the north there is evidence that the parking lot for a large restaurant has existed for many years.
Philip Kruvant testified for plaintiffs. He said that he had driven past the premises many times on Prospect Street, for he has lived in this part of the State. He had some general idea that horses used a portion of Lot B but had not thought about it seriously until 1973 when he had his never-to-be-forgotten chat with the attorney.
The Korvette Shopping Center development was separated from Lot B by another tract of approximately ten acres acquired by another party from Mayfair. This tract is south of the stream that runs from the culvert. Philip Kruvant testified that sometime after 1955 plaintiffs had cleared a portion of Lot B where the meadow, or schooling area, is, by having it bulldozed about 1959-1960. Plaintiffs at that time owned equipment which they used to do site-grading work. The equipment was not in use, so they sent it over to clear the area near Prospect Street.
On cross-examination by Mayfair Philip Kruvant admitted that he was aware of culvert and its use by horses and riders. He further admitted that he was aware that horses were crossing Lot B in the years between 1955 and the conversation in 1973. He conceded that neither he nor plaintiffs took any action to stop the horses until July 1973. Philip Kruvant and his brothers were the principals in Empire. One brother is a lawyer.
A successor in title who continues a use that is adverse may tack the periods of use of the predecessors in title to its own to establish the requisite statutory period. *17 Davock v. Nealon, 58 N.J.L. 21 (Sup. Ct. 1895). The evidence establishes that the club and its predecessors in title have used the bridle trail continuously since November 1, 1945, which is a date more than 20 years before demand was made or suit commenced.
Before reaching conclusions it is necessary to determine what the nature of the rights being asserted are and what principles of law apply. Plaintiffs have pleaded and established by appropriate deeds that they are the record owners of Lot B. Plaintiffs do not seek to oust or eject the club from Lot B but seek to enjoin it from its practice of leading and directing horses which the club owns and controls across said lands.
This is not an action to enforce an entry into real estate. Plaintiffs claim they are the owners and are in possession of Lot B. They only seek to end the club's use of Lot B for a limited purpose. Plaintiffs' right is therefore not one embraced within N.J.S.A. 2A:14-6 and the other statutes of limitation on rights of entry. See Campbell v. Smiths, 8 N.J.L. 140 (Sup. Ct. of J. 1825); Lehigh Valley R.R. Co. v. McFarlan, 43 N.J.L. 605, 617-622 (E. & A. 1881); Plaza v. Flak, 7 N.J. 215 (1951).
The club in its factual contentions attached to the pretrial order states:
* * * [the club] alleges that the riders utilizing its facilities and those of its predecessors in title since 1923 traversed an equestrian trail which crosses plaintiffs' lands and the lands of their predecessors in title in order to gain access to the aforesaid culvert. Further, [the club] alleges that said use has been uninterrupted, continuous, exclusive, visible, notorious and hostile and therefore [the club] either has an absolute right and title to a portion of the premises allegedly owned by plaintiffs or has prescriptively acquired an easement or right of way over said lands.
In substance this is a claim to a right to use a portion of plaintiffs' lands for a bridle trail acquired by adverse user and not a claim to title, for there is no claim of having appropriated the land to the club's entire use, i.e., no claim of possession.
*18 In Plaza v. Flak, supra, the Supreme Court summarized the applicable law as follows:
From an analysis of the authorities above cited it appears: first, that the plaintiff [the person asserting the right to incorporeal hereditament by adverse user] has the burden of sustaining his claim of adverse user; second, when the plaintiff, or the one claiming the right to an easement by prescription, shows open, continuous, uninterrupted, exclusive use for the prescriptive period with the acquiescence of the owner of the servient estate, he has carried his initial burden and a presumption arises that the use was adverse, the burden of adducing evidence contrary to that presumption thus being cast upon the opposing party. The burden of proof remains upon the plaintiff to establish the prescription by the preponderance of the evidence. Compare on the effect of presumption in general Abbott's Civil Jury Trials (5th ed., Viesselman, 1935), sec. 179, p. 411, sec. 188, p. 424; Summary of American Law (Clark, 1947), secs. 63, 64, pp. 602, 604; and third, there is a conflicting presumption with the foregoing rule which may arise where the situation and condition of the land and the uses thereof place the property in the category of vacant, unimproved land, unenclosed, where the use is casual rather than customary. Where land is in that category the use is presumed to have been permissive. [7 N.J. at 222]
The assertion of a right to cross another's lands or to fish, hunt or ride thereon is assertion of a right to an incorporeal hereditament. Plaza v. Flak, supra at 219. Although the statutes of limitation upon which the doctrines of adverse possession have developed to determine when the period of limitations thereunder commenced to run and terminated are not applicable, the courts have applied the same principles and periods of time by analogy to claims founded on incorporeal hereditaments. Plaza v. Flak, supra.
The club has shown that it has used the bridle trail without permission since November 1, 1945. The daily riding of individuals and groups mounted on horseback is an open use. Plaintiffs admit knowledge of the activity. Mayfair is chargeable with knowledge of the activity because of the knowledge of the Horns. There is no evidence that plaintiffs or their predecessors in title attempted to interrupt the use of the bridle trail after November 1, 1945, until the filing of the complaint in this action.
*19 The facts that Martin Horn, Jr., and Donald Horn knew DuBois, that one went to school with his daughter, and that Martin Horn, Sr., knew DuBois and presumably his brothers, are more consistent with acquiescence than permission. Feldman v. Knapp, supra.
In 2 Thompson, Real Property, § 341 at 219 (1961), acquiescence in this context is said to mean "a passive assent or submission, quiescence or consent by silence."
There is no evidence that any person other than a person acting in common with those associated with the club and its predecessors in title used the bridle trail. This distinguishes the facts of this case from those in Hazek v. Greene, 51 N.J. Super. 545 (App. Div. 1958), where the court found that those who rode horses from plaintiff's stable rode over the lands there in question in common with other riders from the general public, and that riders from plaintiff's stable rode over extensive other lands covering an 18-mile area in addition to the property in question. In this case the activity was confined to an 800-foot trail across lands which were in successive single ownership for 20 years. The single owner could at any time have stopped the use by appropriate action. The purpose of the activity was to get to bridle trails established for public use in an area near manor type homes.
Further, the successive purchases of the stable in 1960 and in 1971 entailed large expenditures. The present owner testified the purchase price in 1971 was $160,000. The buildings at the club include stables and supportive facilities for 100 horses, as well as a brick building housing an indoor riding ring. These facilities were intended for the use of horses. The bridle trails in the Reservation were intended for the use of horses. In Cobb v. Davenport, 32 N.J.L. 369, 391 (Sup. Ct. 1867), Justice Depue suggested that if the plaintiff had constructed his hotel to enable the guests to fish for their own immediate profit, an inference might be drawn therefrom that they made a claim to a right of fishery because of the improbability of a man's making such *20 an expenditure on the faith of a precarious privilege. Justice Depue found no such evidence, or evidence which indicated defendant gave assurances that the fishery would remain open so that custom could attach to the hotel and be grounds for an injunction. He found only that plaintiff and his guests fished in the lake or pond along with other members of the public. In this case the daily parade of horses and riders across the lands in question from substantial facilities to bridle trails in the Reservation should, in this court's opinion, have at least aroused inquiry into what was the basis for such activity across Lot B.
Plaintiffs contend that since Lot B was and is vacant, unenclosed and unimproved land, the riding of horses across such lands is more consistent with a permissive use than an adverse use and hence there was no reason for inquiry and no presumption of an adverse use. Plaintiffs rely on such cases as Cobb v. Davenport, supra; Albright v. Cortright, 64 N.J.L. 330 (E. & A. 1899); Baker v. Normanoch Ass'n, Inc., 25 N.J. 407 (1957), and Hazek v. Greene, supra. These cases illustrate the "conflicting presumption" referred to in the quotation from Plaza v. Flak, supra.
The rationale underlying the "conflicting presumption" is that where lands are open, undeveloped and unenclosed they are in a natural state and frequently in large tracts, and owners may not know or care that others use their lands casually. In such circumstances the court of Errors and Appeals said in Albright v. Cortright, supra,
* * * In country life a multitude of acts are habitually committed that are technically trespasses. Persons walk, catch fish, pick berries, and gather nuts in alieno solo, without strict right. Goodnatured owners tolerate these practices until they become annoying or injurious, and then put a stop to them. Little practical inconvenience results from this state of things, which the courts may well leave to regulate itself. * * * [64 N.J.L. at 337-338]
These activities are casual in the sense that the same individuals do not carry them on every day. Owners may not even be aware of the activities, let alone the specific *21 individuals who would have to be sued. Under such circumstances the courts have held that they will presume such activities were permissive and not adverse.
The evidence shows that the activity here was not casual, but daily. The evidence shows that there was a busy thoroughfare, major commercial establishments as early as 1939 in the form of restaurants in the area, and by 1939 the riding was confined primarily to the bridle trail. This court finds that the presumption of permissive use is not applicable. As noted in Albright v. Cortright, supra (64 N.J.L. at 339), "highways and parks are devoted to the public, but one may not, therefore, cross another man's farm in order to reach them." Yet, that in essence is what the riders from the club and its predecessors did, except that the land was not in a rambling, rural agricultural setting.
The court finds that the club and its predecessors in title did use the bridle trail openly, continuously and uninterruptedly for a period of more than 20 years after November 1, 1945. Based upon Plaza v. Flak, supra, the club is entitled to a presumption of adverse use for purposes of a prescriptive easement. For the reasons previously stated plaintiffs cannot claim that the use was permissive because of the "conflicting presumption." They have failed to establish that the use was by permission except in the case of Lanzer and Mateer, matters which ended by November 1, 1945 at the latest.
Although in Plaza v. Flak, supra, the Supreme Court said that the same principles should apply in determining whether a prescriptive easement has been acquired by adverse user as apply in determining whether title has been acquired by adverse possession, also said:
This must be a continuing, open, visible and exclusive user, hostile, showing intent to claim as against the true owner, and must be under a claim of right with such circumstances of notoriety as that the person against whom it is exercised may be so aware of the fact as to enable him to resist the acquisition of the right before *22 the period of prescription has elapsed. Poulos v. Dover Boiler & Plate Fabricators, 5 N.J. 580, 588 (1950); Carlisle v. Cooper, 21 N.J. Eq. 576, 596 (E. & A. 1870). [7 N.J. at 220]
The reference to claim of right in the language of some New Jersey decisions applying a 20-year period of prescription for easements, or a 20-year period under N.J.S.A. 2A:14-6 and 7 for title, is not essential to the holding, and in many the party asserting the right did not base it upon a claim of right. In Braue v. Fleck, 23 N.J. 1, 11-15, (1956), it is pointed out that "claim of right" is used under N.J.S.A. 2A:14-30 and 31 for 30 and 60 year periods, respectively, and has a historic background and present practical difference in respect to the time within which persons under a disability must act once the disability is removed. 13 N.J. Practice (Lieberman, Abstracts and Titles), § 132 (1966). Therefore, the club's lack of a claim of right is not material.
The reference to "hostile" has to be considered in the light of the decision in Mannillo v. Gorski, 54 N.J. 378 (1969), where the Supreme Court held that a person possessing land openly, continuously and notoriously for 20 years under a mistake as to boundary was not required to show a hostile intent. It said:
Accordingly, we discard the requirement that the entry and continued possession must be accompanied by a knowing intentional hostility and hold that any entry and possession for the required time which is exclusive, continuous, uninterrupted, visible and notorious, even though under mistaken claim of title, is sufficient to support a claim of title by adverse possession. [at 386-387]
The reason for the change was to place the innocent party in no worse position than the intentional wrongdoer. The same principle should apply to prescriptive easements acquired by adverse user. The evidence in this case shows only that everyone assumed that they had a right to do what they did; i.e., ride over the bridle trail; hence, they have the same status as those operating under a mistake. *23 As the court has indicated above, the acts of those associated with the Club were sufficiently open, notorious, continuous and limited to a fixed area to put the owners of Lot B on notice to take action. This they did not do for over 20 years.
The court concludes that the club has established a prescriptive easement for the bridle trail. The court finds that the meadow area, or dressage field, was not used until after the area was bulldozed by plaintiffs in 1959 or 1960. The court has weighed the testimony of the witnesses and finds that those who testified about its use at an earlier period were somewhat vague. The court found DuBois accurate in his description of the area in the pre-1960 period and in a position to testify from knowledge and without interest about the condition. The court concludes that the club has not established a prescriptive easement in the meadow area.
Based on these findings the court concludes that at the time Mayfair made the conveyance on December 30, 1955 there was no outstanding easement, for the period of adverse use had not run and therefore there was no breach of the warranties in the deed. Schwartz v. Jones, 57 Tex. Civ. App. 603, 122 S.W. 956 (Civ. App. 1909) (where period of adverse use was not completed until three years after date of conveyance, held, no breach of warranty deed.); compare Felts v. Whitaker, 129 S.W.2d 682 (Tex. Civ. App. 1939), aff'd 137 Tex. 578, 155 S.W.2d 604 (Comm. App. 1941) (no recovery for breach of warranty deed unless plaintiff proves that title by adverse possession has been established in a person other than grantor prior to date of conveyance).
This is consistent with New Jersey law. An easement, if it exists, is a breach of covenant against encumbrances which is only breached if the encumbrance exists at the time the deed is given. Old Falls, Inc. v. Johnson, 88 N.J. Super. 441, 451 (App. Div. 1965). If the matter is considered as a breach of covenant of quiet enjoyment, then the breach arises when there is actual or constructive eviction under a paramount title, and the question is whether this decision produces such a result. See Old Falls, Inc. v. *24 Johnson, supra at 450; 13 N.J. Practice (Lieberman, Abstracts and Titles, § 426 at 307 (1966). The answer is no. The paramount title has to be one that is paramount to the grantor. On the facts here, the Club did not have an interest paramount to Mayfair, the grantor. The club's interest became paramount to plaintiff's under the doctrine of tacking against successive owners.
This leaves the question of what damages, if any, should be awarded to plaintiffs for the meadow area and what remedy should be granted to the club.
Where a party proves that another has trespassed on his lands, he is entitled to nominal damages even if there is no proof of injury or damage to the lands. Prosser, Torts (4 ed. 1971), § 13. The action is directed at the vindication of the legal right.
Plaintiffs have not established that the club and its predecessors damaged the lands, other than trampling some grass and enriching the area with horse manure. Plaintiffs, therefore, are not entitled to damages. They have not proved that they were denied the use of the lands for any activity they had planned.
However, plaintiffs have borne all the carrying costs for Lot B. Without permission, the club has used the meadow area in connection with its profit-making activities.
Although counsel for plaintiffs cited no authority for the proposition that plaintiffs were entitled to recover damages on the basis of rental value or use and occupancy, plaintiffs have asserted such a claim. Plaintiffs first offered the testimony of John Lasser, a licensed real estate broker and an appraiser, to establish the damage to Lot B if a prescriptive easement were established, i.e., loss of value for development purposes. On objection, valuation testimony for this purpose was excluded but plaintiffs were allowed to make an offer of proof as to what a reasonable rent or charge for use and occupancy would be.
Lasser testified that the real estate taxes were $12,000 annually. In his opinion Lot B was worth $250,000. It is *25 zoned for office/research and civic center development. The zoning ordinance calls for 5 A minimum lots with a front setback of 100 feet, side and rear-yard set backs of 75 feet, and permits buildings to occupy 20% of the lot.
On direct examination Lasser testified that in his opinion one-sixth of the carrying charges, allowing a 10% return on the land value, would be a reasonable rent or charge for use and occupancy of the bridle trail and meadow area. On his calculations this is $500 a month. On cross-examination he admitted that he had not measured the area of the bridle trail or meadow. He said that considering the activity and the carrying charges it was his opinion that an allocation of one-sixth of the carrying charges was fair and reasonable.
The court has found no New Jersey case as to whether a landowner is entitled to recover on the basis of rent, or use and occupancy, from a trespasser who has used the property for profit-making activity.
Comment b to § 931 of Restatement, Torts (1939), states:
The owner of the subject matter is entitled to recover as damages for the loss of the value of the use, at the rental value of the * * * land during the period of deprivation. This is true even though the owner in fact has suffered no harm through the deprivation, as where he was not using the subject matter at the time * * *
See also, Restatement, Torts, § 912, comment (g) (1939); 22 Am. Jur.2d Damages, § 135 at 198; Baltimore & O.R. Co. v. Boyd, 67 Md. 32, 10 A. 315 (Ct. App. 1887) (rental value of right of way for a railroad track across unimproved, unenclosed, vacant land held proper measure of damages for period of entry without permission and before condemnation).
The court concludes that where a person uses the land of another to carry on profit-making activities, without permission, the landowner should be able to recover a reasonable rent.
Plaintiffs have offered proof of taxes and that a 10% return on capital would be a fair means of calculating *26 such a charge. They did not measure the meadow area although it is identified on a scaled map prepared for Essex County, as is the bridle trail. This map is in evidence. The club did not offer any contradictory evidence as to value because its objection was sustained. The court notes that there are tax stamps affixed to the deed in 1955 from Mayfair for Lot B. Lasser's opinion of value is substantially higher than the value reflected by the tax stamps. The court directs that parties calculate the meadow area; it will permit the club to submit evidence as to assessment value, or other value, of Lot B, and such comment by memoranda or a hearing (if it desires) as to value upon which return should be allowed. The period for which demand has been made by plaintiffs starts in July 1973 and money damages will be allowed only from that date.
Finally, there remains the question of what relief should be granted the club. It is entitled to a determination that it has a prescriptive easement. The question is whether it should be conditional and, if so, has this court any power to impose conditions based on the facts in this case.
Traditionally, the establishment of the existence of a right to a prescriptive easement by adverse user has been a matter that had to be settled by the law courts, Weber v. L.G. Trucking Corp., 140 N.J. Eq. 96 (E. & A. 1947). Once the existence of the legal right was established, the party holding such right could have it protected in equity. Plaza v. Flak, supra 7 N.J. at 224-225, holds that the Chancery Division may determine the entire matter where a right to a jury trial has been waived.
In this case the claim for prescriptive easement was set up by way of counterclaim in an action begun in the Law Division without a demand for a jury trial. The court has determined that the club has a right to a prescriptive easement.
In Lehigh Valley R.R. Co. v. McFarlan, 43 N.J.L. 605 (E. & A. 1881), Justice Depue, writing for a unanimous court, pointed out that the development of prescriptive easements *27 was the necessary result of the action of the law courts.
At common law there was no fixed period of prescription. Rights were acquired by prescription only when the possession or enjoyment was "time whereof the memory of man ran not to the contrary." By 20 Hen. III., c. 8, the limitation in writs of right dated from the reign of Henry II. By 3 Ed. I., c. 39, the limitation was fixed from the reign of Richard I. By 21 Jac. I., c. 16, the time for bringing possessory actions was limited to twenty years after the right accrued. These statutes applied only to actions for the recovery of land; none of them embraced actions in which the right to an incorporeal hereditament was involved. But by judicial construction an adverse user of an easement for the period mentioned in the statutes, as they were passed from time to time, became evidence of a prescriptive right; and finally, the fiction was invented of a lost grant, presumed from such user to have once been in existence and to have become lost. * * * It was called a lost grant, not to indicate that the fact of the existence of the grant originally was of importance, but to avoid the rule of pleading requiring profert * * * and bringing the instrument into court.
Whatever strictures may have been made upon this method of judicial legislation, the fiction has been promotive of beneficial results, and forms the basis for prescriptive titles, and it is now too late to question the validity of its introduction. * * * [at 617]
In Plaza v. Flak, supra, the Supreme Court recognized that the doctrines pertaining to prescriptive easements are still being developed by the courts when it stated that the theory of the lost grant is more or less in dispute today and the principles of adverse possession should apply. See 7 N.J. at 219.
In Mannillo v. Gorski, supra, the Supreme Court held that the element of hostility should no longer form a part of the doctrines used in adverse possession. It went on to say:
Where application of rule that minor encroachment along common boundary will be open and notorious only where true owner has actual knowledge thereof results in undue hardship, equity may furnish relief, and if innocent trespasser of small portion cannot without great expense remove or eliminate the encroachment or such removal or elimination is impractical, true owner may be forced to convey land so occupied on payment of fair value thereof without regard to whether true owner had notice of encroachment at its inception. [54 N.J. at 380] *28 The Supreme Court there at least suggests that in appropriate circumstances equitable relief should be considered as well as injury to adjoining property.
The bridle trail as established by the evidence produced at trial will substantially interfere with the orderly development of Lot B because it traverses the lot diagonally for 800 feet.
However, the trail can be precisely located both from testimony and a map introduced into evidence developed by the photometric process from aerial photographs. It is no more than ten feet in width. The purpose of the bridle trail is to permit horses to gain access to the present culvert for the purpose of going to the Reservation.
The present zoning ordinance requires 75-foot side yard setbacks and a 100-foot set back in the front. If, at the time Lot B is developed, a new bridle trail were provided in the setback areas with an appropriate cut for a drop in the grade of the trail to permit vehicles to pass overhead and the horses to reach the culvert, then Lot B may be developed without substantial interference from the bridle trail.
In response to the court's request to all counsel to express their views on the power of the court to require relocation, counsel for plaintiffs submitted a memorandum of law in support of such a requirement; counsel for the club summitted none but only stated there was no such power.
Plaintiffs urged that under N.J. Const. (1947), Art. VI, § III, par. 4 the Law Division may exercise the powers of the Chancery Division when the ends of justice so require. They further cited Fortugno v. Hudson Manure Co., 51 N.J. Super. 482, 501-502 (App. Div. 1958); American Ass'n of Univ. Profs. v. Bloomfield College, 129 N.J. Super. 249, 274 (Ch. Div. 1974) and Union Minerals v. Port Realty, 129 N.J. Super. 41, 45 (Ch. Div. 1974), for the proposition that the absence of precedent is no ground for equity denying relief where it can shape relief that is appropriate to a particular case.
*29 Plaintiffs also cited Brown v. Bradbury, 110 Colo. 537, 135 P.2d 1013 (Sup. Ct. 1943), where the appellate court affirmed the trial court's denial of an injunction to restore an irrigation ditch which had run through the center of defendant's property and interfered with its proper development, where defendant had constructed a new irrigation ditch which assured as much, or more, water to plaintiff at the same point on plaintiff's farm.
In 2 Thompson, Real Property, § 440 (1961 replacement) it is stated:
Once an easement has been finally established it can only be altered by mutual agreement, injury to the servient tenement, or the changed needs of the dominant tenement, or owner of the easement. To do otherwise would affect the value of and prevent the improvement of the servient tenement and encourage litigation, and would amount to the taking of private property of one person by another. Under the civil law, however, the servient owner may alter the servitude if the same convenience is afforded the dominant owner under similar conditions, and a few common law cases are similar. [at 758]
In Jaqui v. Johnson, 27 N.J. Eq. 526 (E. & A. 1875), the court affirmed the granting of an injunction restraining the owner of the dominant tenement from relocating an aqueduct and submitting an underground pipe two feet in diameter for the wooden leader measuring seven by ten inches that formed the aqueduct. The court said that the enlargement of the pipe would take much more water than was intended. It also held that to permit defendant to relocate the aqueduct wherever he wanted would unreasonably burden plaintiff's property, contrary to the terms of the deed upon which defendant's rights depended.
In Manning v. Port Reading R.R. Co., 54 N.J. Eq. 46 (Ch. 1895), plaintiff had established in an action at law that he had a private right of way from a public road to a timber tract, across which right of way defendant had erected its railroad tracks on the top of a ten-foot embankment and blocked plaintiff's right of way. Plaintiff asked *30 that the court order defendant either to construct an underpass through the embankment or to move its tracks. Defendant showed that it had constructed a road on each side of the embankment running parallel with its tracks, plaintiff had access thereto, and there was a public grade crossing 250 feet northeasterly of plaintiff's right of way. The court held that it would grant no relief but that it would give defendant six months time to condemn the right of way, and if it did not, it would order removal of the obstruction to the private way which had been established by prescription. The court said:
I am also satisfied that the defendant is without power to change the location of the complainant's right of way and substitute another way for it. [At 49, Citations omitted]
In Tide-Water Pipe Co. v. Blair Holding Co., Inc., 42 N.J. 591 (1964), the Supreme Court affirmed the trial court's order that defendant relocate plaintiff's pipeline at defendant's expense and grant a new easement, where defendant had constructed a new building over plaintiff's pipeline easement. The court took the position (at 604) that a "landowner may not, without the consent of the easement holder, unreasonably interfere with the latter's rights or change the character of the easement * * *." See Ingling v. Public Service Elec. & Gas Co., 10 N.J. Super. 1, 8 (App. Div. 1950).
In Gilpin v. Jacob Ellis Realties, Inc., 47 N.J. Super. 26 (1957), the Appellate Division affirmed denial of plaintiff's request for a mandatory injunction to have defendant tear down four feet of a 25-foot high building erected upon a four-foot setback easement existing for the benefit of plaintiff's land on which a 46-year-old movie theatre stood. As an alternative the trial court gave $1,000 in damages. The Appellate Division stated that it was applying the doctrine of relative hardship. This case was cited with approval in the Tide-Water Pipe case, supra 42 N.J. at 600.
*31 The foregoing New Jersey decisions recognize and apply the general principles of easement law. The author of Annotation, "Relocation of Easements," 80 A.L.R.2d 743 (1961), correctly states that there are few decisions on the question of whether a court may relocate an easement.
Analysis of those cases shows that the courts have permitted a relocation to take place without consent by denying injunctive relief to restore the former condition. The cases have to be read carefully for they reflect a lack of intent to do harm to plaintiff and a lack of harm in fact. In these cases defendants have acted to protect the plaintiff's basic interests, e.g., assuring plaintiff the same quantity of water at the same place even though the ditch was filled in, and defendant bore the expense. Brown v. Bradbury, supra.
In Millson v. Laughlin, 217 Md. 576, 142 A.2d 810, 80 A.L.R.2d 731 (1958), the Court of Appeals affirmed the entry by the trial court of a decree which permitted plaintiff to relocate a pole supporting an electric line that supplied power to defendant from a point next to a site where plaintiff proposed to build a home. The easement was initially established by use. The court said:
* * * The exact location of the supports for the line or the exact route of the line across appellee's property can make no difference to Mrs. Millson. We think it was not the intention of the parties to unduly burden the property now owned by the appellee by freezing for all time the exact location of the pole which is the bone of contention in this case. [217 Md. at 584, 142 A.2d 814]
and concluded:
The plaintiff has the right to relocate the pole and line in such a manner that the line will exit from the Sprague property at its present location and that it will enter the property of the appellant at its present location and angle  all without cost to her. [217 Md. at 587, 142 A.2d 816].
Plaintiffs have a 10 A tract and have a right to know whether it can, or cannot, be developed. Because of developments *32 in the law made by courts, the club has acquired a valuable right in plaintiff's lands without cost. The club also has a right to know what to plan for the future.
Based on the facts in this case and the development of the law regarding adverse possession and prescriptive easements reflected in the decisions cited above, it is this court's conclusion that the club has a prescriptive easement for the bridle trail in its present location subject to a right in plaintiffs, or their successors or assigns, to relocate the bridle trail at the time the land is developed at plaintiffs' or its successors' or assigns' own expense, provided that the club has entry at the same point and access to the culvert. Such relocation and any construction shall be subject to the club's or its successors' or assigns' approval, which shall not be unreasonably withheld. The club shall prepare an exhibit at its expense showing the dimensions and locations of the present bridle trail for inclusion in the final judgment.