715 A.2d 1006 (1998)
314 N.J. Super. 560
Howard STUMP and Catherine Stump, Plaintiffs-Appellants,
v.
WHIBCO, formerly known as Whitehead Brothers Company, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued February 11, 1998.
Decided September 3, 1998.
*1008 James J. Seeley, Bridgeton, for plaintiffs-appellants (Seeley & Jones, attorneys; Mr. Seeley, on the brief).
Jeffrey S. Beenstock, Voorhees, for defendant-respondent (Levin & Hluchan, attorneys; Richard M. Hluchan, of counsel; Mr. Beenstock, on the brief).
Before Judges KING, KESTIN and CUFF.
*1007 The opinion of the court was delivered by KESTIN, J.A.D.
Plaintiffs sued to quiet title to a parcel of land which they occupied and of which they claimed ownership by adverse possession. Defendant counterclaimed for possession and the removal of plaintiffs' encroachments. After a bench trial, judgment was entered for defendant on the adverse possession claim and the complaint was dismissed. The trial court retained jurisdiction over the encroachment issue.
With a claim for relief retained, the trial court's disposition is interlocutory, i.e., not "final both as to all issues and all parties," see Pressler, Current N.J. Court Rules, comment 2 on R. 2:2-3 (1997); and the appeal is, therefore, subject to dismissal. Ibid. Nevertheless, given the nature of the case and the posture of the issues, we elect, in the interests of justice, to regard the *1009 notice of appeal as a motion for leave to appeal, which we now grant nunc pro tunc. Ibid.

I
Plaintiffs, Howard and Catherine Stump, own property along the Maurice River in Maurice River Township adjacent to land owned by defendant Whibco, Inc. The parcel which is the subject of this litigation is along the boundary separating the Stump property from that of Whibco, on the Whibco side of the boundary line. The trial court found the disputed area was
triangular and measures 52½ feet at its widest point and narrows as it tapers in a generally southerly direction proceeding away from the bank of the Maurice River [over a course of 618.5 feet].... The disputed area is part of Block 107 Lot 11 on the tax maps of Maurice River Township owned by Whibco and consisting of seven and one-half acres. Part of the disputed area is located within a riparian grant held by Whibco.
Plaintiffs' adverse possession claim was governed by N.J.S.A. 2A:14-30, which requires 30 years of "actual possession" for real estate that is not "woodlands or uncultivated" in order to "vest a full and complete right and title" in the adverse possessor. Whibco's counterclaim for ejectment came under N.J.S.A. 2A:35-1, and its claim for damages for unlawful detainer was under the aegis of N.J.S.A. 2A:39-8.
Whibco purchased its property on June 6, 1974 from the United States Small Business Administration. The Stumps bought their property from Paul and Theania Cox on June 13, 1974. The Coxes had owned the property since 1948, and had operated thereon a boatyard and a small marina. Their son, Paul Cox, Jr., testified that a wire mesh fence was located on the property when his parents first purchased it.
The trial court found that the Coxes had replaced the mesh fence with a railroad tie and cable fence during their tenure as owners and that this was done "without the benefit of a survey." The court determined further "that to the extent Cox, or later Stump, concluded that the fence was the true common boundary line between the properties, such conclusion(s) is/are mistakes of fact."
According to a survey prepared on January 2, 1990, and revised on December 27, 1994, the fence was an encroachment on Whibco's property. The trial judge found that the survey "accurately locate[d] the boundary line between the Stump property and the Whibco property and also properly locate[d] the riparian grant area."
The trial court further found that although the Stumps asserted
that they were unaware of any indication that the fence was not the boundary line; however, Whibco's records ... and conversations between Whibco and Stump refer to the "encroachments" as early as 1976. Cox treated the fence as the boundary line and utilized, in mostly a passive way, the area up to the fence. Stump continued the passive use (boat storage, for example) until making a series of improvements to the area commencing in 1981.
These improvements were noted by the court to include
a concrete walkway, bulkhead, boat ramps and sign, as well as concealed encroachments, such as underground conduit and septic systems [which were located] to the east of the fence, but yet still on Whibco's land[.]
The trial court, in a letter opinion, held that plaintiffs had not made out their claim for adverse possession:
[Plaintiffs'] claim is based on N.J.S.A. 2A:14-30, which provides that:
Thirty years' actual possession of any real estate excepting woodlands or uncultivated tracts, and sixty years' actual possession of woodlands or uncultivated tracts, uninterruptedly continued by occupancy, descent, conveyance or otherwise, shall, in whatever way or manner such possession might have commenced or have been continued, vest a full and complete right and title in every actual possessor or occupier of such real estate, woodlands or uncultivated tracts, and shall be a good and sufficient bar to all claims that may be made or actions commenced *1010 by any person whatsoever for the recovery of any such real estate, woodlands or uncultivated tracts.
New Jersey Courts have held that the burden of proof rests on the party claiming title by adverse possession and that any adverse possession must be open, notorious, continuous, uninterrupted and exclusive for the prescriptive period with the acquiescence of the owner. After evidence is introduced on these jurisdictional elements, then a presumption arises that the use was adverse except when the land is vacant, unimproved, unenclosed and the use is casual rather than customary. Patton v. North Jersey Dist. Water, 93 N.J. 180, 459 A.2d 1177 (1983), Mannillo v. Gorski, 54 N.J. 378, 255 A.2d 258 (1969), Maggio v. Pruzansky, 222 N.J.Super. 567, 537 A.2d 756 ([App.Div.] 1988). As Justice Haneman instructs in Mannillo v. Gorski, supra, there is a caveat concerning the presumption and the necessary standard of open and notorious possession.... The foundation of so-called title by adverse possession is the failure of the true owner to commence an action for the recovery of land within the period designated by the statute. However, no presumption of knowledge arises from a minor encroachment. That is, the true owner is not charged with knowledge of an encroachment unless or until it takes on characteristics of acts of dominion over the land. ["]That failure [to take action] is relevant only if the owner has had notice, actual or constructive, that another considers himself to be, or is using the property as, the owner. Therefore, one criterion of adverse possession is that the use must be so open and notorious that an ordinarily prudent person would be put on notice that the land is in actual possession of another.["] Patton v. North Jersey Dist. Water, supra [, 93 N.J. at 186, 459 A.2d 1177].
In this case, the encroachment was nothing more than a wire mesh fence and later a railroad tie cable fence from perhaps as early as 1948 until 1981. Mr. Stump testified that the septic system was installed in 1981, the boat ramp in 1983, the bulkhead in 1985, the sign in 1990. The Court concludes that based upon the testimony the open and notorious aspects of the Stump possession of the lands began in 1981 and became more open and more notorious thereafter as the various improvements were placed. Prior to 1981, the uses of the disputed area by Stump, and earlier by Cox, were passive uses such as occasional storage which did not rise to the level of acts of dominion. Consequently, such passive uses were not open and notorious. Accordingly, the Court concludes that the defendants were not chargeable with knowledge of the plaintiffs' adverse possession claim until 1981.
The Court concludes as a matter of law that no presumption of knowledge arose from the prior minor and passive encroachments along the common boundary line before 1981. The presence of the fence on Whibco property is concluded by the Court to have been a minor encroachment. The Whibco land is a seven and one-half acre parcel. The fence encroaches by 52½ feet at its widest point and tapers to an encroachment of less than 1 foot as it approaches Fish Factory Road. This case amounts to a minor border encroachment that would call for an on-site survey for the determination of the actual boundary line.
As a general rule, successors in title who continue adverse uses may tack the periods of adverse uses of predecessors to establish the statutory period. Kruvant v. 12-22 Woodland Ave. Corp., 138 N.J.Super. 1, 350 A.2d 102 ([Law Div.] 1975) [, aff'd, 150 N.J.Super. 503, 376 A.2d 188 (App.Div.1977)]. However, in order for successors to gain the benefit of tacking, the predecessors' uses must also be open and notorious and must meet the other jurisdictional elements. In this case, tacking should not be allowed as a matter of law. The statutory period of thirty (30) years is not met. N.J.S.A. 2A:14-30.
Because the jurisdictional criteria ha[ve] not been met by Stump, judgment of no cause for action is entered in favor of Whibco.

II
The trial court was correct to posit that "[a]s a general rule, successors in title *1011 who continue adverse uses may tack the periods of adverse uses of predecessors to establish the statutory period." In this connection Whibco contends that the Stumps did not, even with such tacking as may properly be recognized, establish continuous occupancy for thirty years, as is required to prevail on their adverse possession claim. There is a specific contention stemming from the fact that before they took title to the Cox property, the Stumps and their business partner, Ed Borowski, first leased the property from the Coxes. The partners fell out, and Borowski prevented the Stumps from entering the property for at least a year.
The tacking principle is well established in this State. See Kruvant v. 12-22 Woodland Ave. Corp., 138 N.J.Super. 1, 16, 350 A.2d 102 (Law Div.1975), aff'd, 150 N.J.Super. 503, 376 A.2d 188 (App.Div.1977) (citing Davock v. Nealon, 58 N.J.L. 21, 32 A. 675 (Sup.Ct.1895)). See also Maggio, supra, 222 N.J.Super. at 574, 537 A.2d 756; Leach v. Anderl, 218 N.J.Super. 18, 29, 526 A.2d 1096 (App.Div.1987); Heck v. Cannon, 24 N.J.Super. 534, 540, 95 A.2d 23 (Ch.Div. 1953). When ownership during the statutory period involves more than one adverse possessor, each owner who acquires title must satisfy all the elements of adverse possession. 7 Powell on Real Property § 1014[2], at 91-61 (Dannenberg rev.1990). Tacking is generally permitted "unless it is shown that the claimant's predecessor in title did not intend to convey the disputed parcel." Id. at 91-60.
What constitutes continuous possession depends on the nature of the land at issue. Some property is only used seasonally, for example. Id. § 1013[2], at 91-23. In general, however, "periodic or sporadic acts of ownership are not sufficient to constitute adverse possession." Id. at 91-24. Accordingly,
The claimant must have affirmatively and consistently acted as if he were the owner, taking into due account the reasonable uses for which the land in question was suitable. It thus suffices if land chiefly timbered is fenced and is cultivated in the areas suitable for cultivation; if land most suitable for seasonal or weekend and holiday use is used for these purposes, even though not during the winter; or if ravined range land is used for the purposes possible in view of its topography.

[Id. at 91-27.]
The adverse claimant must prove that he or she "has acted towards the land in question as would an average owner, taking properly into account the geophysical nature of the land." Id. at 91-44. Powell on Real Property lists storage as one of the activities which, if consistently done, meets this standard; and includes fencing"substantial enclosure"as one of the two most significant activities. (Paying taxes on the property is the other.) Id. at 91-46-47. Abandonment by the adverse possessor breaks the continuity, but departure caused by a "supervening force" does not. Id. at 91-28.
When a third party, one who is neither the true owner nor the adverse possessor, interferes with possession, "it seldom constitutes an interruption of possession." Id. at 91-26. This is particularly true "when the possessor acts with diligence to protect his possession against such an act." Ibid.
Most of the case law on interruption of possession addresses a situation where the "true owner" asserts dominion over the real property in question. The critical point seems to be, not that a third, unrelated party has or has not excluded the putative adverse possessor from the land; but that the true owner has not acted in such a manner as to reclaim it. See, e.g., Johnston v. Fitzgeorge, 50 N.J.L. 470, 14 A. 762 (Sup.Ct.1888) (owner had brother remove a fence, and had nephew clean the premises, level off the ground and spread ashes; it was a jury question as to whether an inference of interruption of possession ought to be drawn). Such case law as there is regarding third partiesat least, those who are not trespasserssuggests that, for adverse possession purposes, it is essential that the land be occupied by someone other than the true owner, as opposed to being left without any person at all exercising dominion over it. See, e.g., Ray v. Beacon Hudson Mountain Corp., 88 N.Y.2d 154, 643 N.Y.S.2d 939, 942, 666 N.E.2d 532 (1996) (continuous possession interrupted where *1012 adverse possessor abandons land; where intruder makes possession nonexclusive; where record owner ejects adverse possessor); cf. Leigh v. Howard, 87 N.J.L. 113, 114, 93 A. 680 (Sup.Ct.1915) (corporation president cannot possess adversely to corporation, unless express notice to directors is given: "Mere open notorious possession in such a case is not adverse; since it must be presumed that the president is holding for the company, to which he stands in the position of trustee"). See also Doyle v. Ellis, 549 S.W.2d 62, 64-65 (Tex.Civ.App.1977) (adverse possessor sold property he had fenced and claimed, then later foreclosed on buyer for failure to pay; "the right of possession of each was referable to that of the other," and this privity of possession permitted tacking).
In the present case, the partnership relationship between Borowski and Stump adds an unusual element, since through the agency relationship between partners it could be argued that Borowski's acts were attributable to Stump for adverse possession purposes. However, the fact remains that the Coxes, at the time of the Borowski occupancy, were still the owners of the property to which the adverse use attached, and were leasing it out. Thus, the Coxes were using the property in a manner "consistent with acts of possession that ordinary owners of like properties would undertake[; `t]he character of disputed property is crucial in determining what degree of control and what character of possession is required to establish adverse possession'." Ray, supra, 643 N.Y.S.2d at 942, 666 N.E.2d 532 (citation omitted). The Coxes conducted a marina business on the property; Borowski did the same; and subsequently, the Stumps did the same. The fence remained in place throughout the tenure of each; and the record supports the trial court's finding that, until the 1990 survey showed otherwise, the fence was regarded by all involved as the boundary line of the property.
Thus, the adverse possession of the disputed property was not interrupted during the period of time when Borowski occupied the land and excluded Stump. To the extent that very exclusion might conceivably be taken as evidencing an exercise of dominion over the land by Borowski, it must be seen to have been adverse to the rights of the true owner, Whibco, and its predecessors in interest.

III
Another point advanced by Whibco, based upon the venerable doctrine nullum tempus occurrit regi, "time does not run against the sovereign," see Devins v. Borough of Bogota, 124 N.J. 570, 575, 592 A.2d 199 (1991), is, too, an inadequate basis for denying the Stumps' adverse possession claim. This argument, also implicating tacking elements and considerations of continuous possession, is premised upon the fact that the Whibco property came into the possession of the Small Business Administration for part of 1974, and was thus owned by the United States prior to its purchase by Whibco. Whibco argues that since adverse possession cannot be asserted against the United States, the continuity of adverse occupancy must necessarily be interrupted during the period of federal ownership. Although the trial court did not rule upon this issue, we address it for the sake of completeness because it bears so directly upon the adverse possession claim.
The Quiet Title Act of 1972 (QTA), 28 U.S.C. § 2409a, which establishes rules governing quiet title suits against the United States, states:
(n)Nothing in this section shall be construed to permit suits against the United States based upon adverse possession.

[28 U.S.C. § 2409a(n).]
See Dunbar Corp. v. Lindsey, 905 F.2d 754, 760 (4th Cir.1990) (pursuant to QTA adverse possession claim cannot run against United States); Sweeten v. Department of Agriculture Forest Serv., 684 F.2d 679, 682 (10th Cir.1982) (fence line is no basis for adverse possession claim against public lands). Even apart from the QTA, it has been well established that adverse possession is not applicable to property owned by the United States. See United States v. California, 332 U.S. 19, 40, 67 S.Ct. 1658, 1669, 91 L. Ed. 1889, 1900 (1947) ("The Government, which holds its interests ... in trust for all the people, is not to be deprived of those interests by the *1013 ordinary court rules designed particularly for private disputes over individually owned pieces of property; and officers who have no authority at all to dispose of Government property cannot by their conduct cause the Government to lose its valuable rights by their acquiescence, laches, or failure to act"); cf. Camp Clearwater, Inc. v. Plock, 52 N.J.Super. 583, 604, 146 A.2d 527 (Ch.Div. 1958), aff'd, 59 N.J.Super. 1, 157 A.2d 15 (App.Div.1959), certif. denied, 32 N.J. 348, 160 A.2d 846 (1960) (easement by prescription cannot be created in lands while United States holds title).
Whibco argues from this principle that, because the Small Business Administration, an extension of the federal government, had title to Whibco's property in 1974, no adverse possession claim can be maintained against the property that tacks on the years prior to 1974 as part of the period of alleged continuous occupancy. As precedent, Whibco relies heavily on Camp Clearwater, where an easement, rather than fee simple ownership, was at issue, and the rule was stated to be:
Where there was a period of adverse possession prior to acquisition of title to the servient estate by the government, "and another such period after the governmental entity had conveyed title out of itself .... courts have looked solely to the length of adverse holding after the government deed and denied the acquisition of prescriptive title where such a period was less than the applicable statute of limitations."
[Id., 52 N.J.Super. at 605, 146 A.2d 527, quoting from J.H. Crabb, Annotation, Tax Sales or Forfeitures by or to Governmental Units as Interrupting Adverse Possession, 50 A.L.R.2d 600, 604 (1956).]
This conclusion echoes the reasoning of an earlier United States Supreme Court case:
[T]he rule that time does not run against the State has been settled for centuries, and is supported by all courts in all civilized countries. Suppose that ... still it is insisted that ... the period of adverse possession before ... forfeiture and the period subsequent to ... conveyance by the State to the plaintiff ... may be added together and considered as one entire period, for the purpose of [adverse possession]. But the proposition cannot be admitted, as it is well settled law that the possession, in order that it may bar the recovery [by the true owner], must be continuous and uninterrupted as well as open, notorious, actual, exclusive and adverse.
[Ibid. (quoting Armstrong v. Morrill, 81 U.S. (14 Wall.) 120, 20 L. Ed. 765, 772 (1872)).]
Camp Clearwater applied this principle within the context of federal supremacy:
Since the United States is not subject to the jurisdiction of a state, the state is without power to prescribe the time within which the United States shall assert its rights in order to preserve them, and it must be regarded as settled that state statutes of limitation do not apply to the federal government; consequently, no title to public lands of the United States can be acquired by adverse possession or prescription during the time the United States holds title thereto, unless, of course, ... the United States consents to be bound by a limitation statute.
[Id., 52 N.J.Super. at 604, 146 A.2d 527 (quoting R.P. Davis, Annotation, Acquisition By Adverse Possession or Use of Public Property Held By Municipal Corporation or Other Governmental Unit Otherwise Than For Streets, Alleys, Parks or Common, 55 A.L.R.2d 554, 563 (1957)).]
More recently, in Devins v. Borough of Bogota, supra, Justice Pollock, writing for a unanimous court, noted that prior New Jersey cases based upon nullum tempus "have all involved land dedicated to or used for a public purpose." Id., 124 N.J. at 575, 592 A.2d 199. The reasoning behind the nullum tempus principle was that "the king was too busy protecting the interests of his people to keep track of his lands and to bring suits to protect them in a timely fashion." Id. at 575-76, 592 A.2d 199. Considerations of sovereign immunity also justified the principle that "the king established his own rules for litigation." Id. at 576, 592 A.2d 199.
*1014 Devins pointed out that commentators had been advocating abrogation of nullum tempus in adverse possession actions, and a congressional commission had actually recommended the doctrine's abolition in that context. Id. at 578, 592 A.2d 199. The Court's determination in Devins, based on public policy considerations, was that real property owned by a municipality is to be treated as if it were privately owned property, unless that property was "dedicated to or used for a public purpose." Ibid. This would "encourage municipalities to make efficient use of their property and return it to the tax rolls," as opposed to "a policy that would encourage municipalities not to use, dedicate, or even identify their property." Id. at 578-79, 592 A.2d 199. Nullum tempus, the Court observed, was "an anachronism," at least with regard to municipally owned real estate. Id. at 579, 592 A.2d 199. These principles enunciated by New Jersey's Supreme Court inform our analysis of the federal Quiet Title Act, and its impact upon adverse possession claims respecting land that once was federally owned.
The United States Supreme Court, ruling on a suit by the State of North Dakota against federal officials, found that "Congress intended the QTA to provide the exclusive means by which adverse claimants could challenge the United States' title to real property." Block v. North Dakota, 461 U.S. 273, 286, 103 S.Ct. 1811, 1819, 75 L. Ed.2d 840, 853 (1983). The Court particularly noted with regard to a provision establishing a 12 year statute of limitations for quiet title actions under the Act: "Section 2409a(f) ... does not purport to strip any State, or anyone else for that matter, of any property rights." Id. at 291, 103 S.Ct. at 1822, 75 L. Ed.2d at 856 (emphasis added). The purpose of the Act was to provide a remedy for citizens who wished to assert rights against land claimed by the United States, but who were precluded from so doing by the doctrine of sovereign immunity. Id. at 282, 103 S.Ct. at 1817, 75 L. Ed.2d at 850-51.
Referring to certain common law claims brought against a native village and native regional corporation by three Alaskan homesteaders in a dispute over land which had earlier been under federal control, one federal court commented:
The QTA ... does not bar these claims, since under its plain terms, the QTA applies only to claims brought "to quiet title against the United States. * * * Congress passed the QTA as a limited waiver of sovereign immunity for actions to acquire title from the federal government,... ., not to insulate private parties who acquire federal lands ... from bona fide actions to challenge their title."
[Lee v. United States, 629 F.Supp. 721, 727 (D.Alaska 1985) (citations omitted).]
A similar conclusion was reached by the Mississippi Supreme Court in Key v. Wise, 341 So.2d 1326 (Miss.1977). Wise concerned a quiet title action by would-be adverse possessors. Id. at 1326. The United States had conveyed an easement for a dam constructed by the U.S. Corps of Engineers in 1962 to the title owners. The court held that, since no "interest claimed by the United States" was involved, the United States was not a party to the case:
[The QTA] does not apply in disputes between private parties as to the private ownership of land or deprive the Mississippi courts of jurisdiction of litigation involving the interests of private persons in Mississippi real estate.

[Id. at 1327.]
Similarly, in the present case, the United States is not a party to the adverse possession claim at issue. Mindful of the policies enunciated by the New Jersey Supreme Court in Devins, especially as regards the most efficient use of land, as well as the legislative intent behind the Quiet Title Act as articulated by the United States Supreme Court, we hold that application of the nullum tempus doctrine does not interrupt continuity of occupancy for the purposes of an adverse possession claim in respect of land owned privately at the time of the claim on the ground that title was once briefly held by a federal agency.

IV
With our determination that the circumstances do not disallow tacking and that *1015 plaintiffs are not precluded by the doctrine of nullum tempus from advancing their adverse possession claim, the question remains whether plaintiffs have made the necessary showing that will enable them to prevail. We conclude, as the trial court did, that plaintiffs have not made the requisite showing and, accordingly, we affirm. We differ with the expressed basis of the trial court's decision, however. The "minor encroachment" rationale employed by the trial judge does not withstand analysis in the light of the record and established rules of law governing that concept. Nevertheless, in the final analysis, plaintiffs have failed to sustain their burden of proving "open and notorious" possession for the requisite period of time.
The concept of adverse possession has been a part of American law since colonial times. See Jeffrey M. Netter, et al., An Economic Analysis of Adverse Possession Statutes, 6 Int'l Rev. of L. and Econ. 217 (1986); see also Denise V. Tighe, Devins v. Borough of Bogota; Municipal Property for Sale or Theft, 45 Rutgers L. Rev. 197, 201-05 (1992). The doctrine has a number of justifications. Perhaps the most important of these is "that it promotes active and efficient use of land." Id. at 218. See also John G. Sprankling, An Environmental Critique of Adverse Possession, 79 Cornell L. Rev. 816, 872 (1994) (abandoning owner is "quintessential villain in the adverse possession drama"); Paula R. Latovick, Adverse Possession Against the States: The Hornbooks Have it Wrong, 29 U. Mich.J.L. Reform, 939, 941 (1996) (premise is punishment of owner for unproductive use of land, and reward of adverse possessor who works land).
Traditionally, in order to prevail on an adverse possession claim
a claimant must demonstrate actual, open and notorious, exclusive, continuous and hostile possession of the premises for the prescribed statutory period under a claim of right or color of title. Each of these elements must be present[.]
[7 Powell on Real Property, supra, § 1013[1].]
Cf. Maggio v. Pruzansky, supra, 222 N.J.Super. at 575, 537 A.2d 756. However, in 1969, with Mannillo v. Gorski, supra, the New Jersey Supreme Court did away with hostility [*] as an essential element of adverse possession, ruling that "any entry and possession for the required time which is exclusive, continuous, uninterrupted, visible and notorious, even though under mistaken claim of title, is sufficient to support a claim of title by adverse possession." Id., 54 N.J. at 386-87, 255 A.2d 258.
Those who seek to establish adverse possession bear the burden of proof by a preponderance. Patton v. North Jersey District Water Supply Comm'n, 93 N.J. 180, 187, 459 A.2d 1177 (1983). However, once evidence is introduced of "an open, continuous, uninterrupted exclusive use for the prescriptive period with the acquiescence of the owner, a presumption arises that the use was adverse except when the land is vacant, unimproved, unenclosed, and the use is casual rather than customary." Ibid.
Mannillo v. Gorski, supra, also recognized the minor encroachment exception:
"[T]he occupation or possession [of the land claimed in adverse possession] must be of that nature that the real owner is presumed to have known that there was a possession adverse to his title...." However, when the encroachment of an adjoining owner is of a small area and the fact of an intrusion is not clearly and self-evidently apparent to the naked eye but requires an on-site survey for certain disclosure ... [the presumption of adverse use] is fallacious and unjustified. The precise location of the dividing line is then ordinarily unknown to either adjacent owner and there is nothing on the land itself to show by visual observation that a hedge, fence, wall or other structure encroaches on the neighboring land to a minor extent. Therefore, to permit a presumption of notice to arise in the case of minor border *1016 encroachments not exceeding several feet would fly in the face of reality and require the true owner to be on constant alert for possible small encroachments.
[Mannillo, supra, 54 N.J. at 388, 255 A.2d 258 (citation omitted) (quoting Foulke v. Bond, 41 N.J.L. 527, 545 (E & A 1879)).]
See also Maggio v. Pruzansky, supra, 222 N.J.Super. at 578-82, 537 A.2d 756.
Our disagreement with the trial court that the minor encroachment exception is applicable here is based upon such considerations of quality. A minor encroachment is, by definition, an intrusion so small that it cannot easily be detected without a survey, and thus it cannot be presumed that the true owner is aware of it. Mannillo involved an incursion of steps and a concrete walk which intruded fifteen inches onto the land of the true owner. Mannillo, supra, 54 N.J. at 382, 255 A.2d 258. In Maggio, the infringement amounted to slightly more than a foot-long strip of land along a masonry wall; and the supposed acts of dominion consisted of cutting grass and planting flowers on land adjacent to the wall. Maggio, supra, 222 N.J.Super. at 573, 537 A.2d 756.
The trial court in evaluating the Stumps' claim herein underemphasized the importance of enclosurethe fencing-in of landin adverse possession law. The fencing of land by a claimant is evidence of possession and assertion of ownership. "[E]ither of itself or in connection with other acts of dominion it [may] be sufficient" to support an adverse possession claim. 3 Am. Jur.2d Adverse Possession § 36 (1986). Where fencing alone is the evidence on which an adverse possession claim is based,
it must, to be effective, be complete and so open and notorious as to charge the owner with knowledge thereof. The question ... is whether the inclosure, like other acts of possession, is sufficient to "fly the flag" over the land and put the true owner on notice that the property is held under an adverse claim of ownership. This rule is applicable where a fence or a hedgerow or the like is relied on to delineate the boundaries of the adverse claim.

[Ibid.]
This was plainly the case in Plaza v. Flak, 7 N.J. 215, 81 A.2d 137 (1951), involving a disputed area between two houses in Passaic, where the court observed:
The old fence in the rear had been there for 25 years prior to the time plaintiff acquired the property. It obviously constituted an open, continuous, hostile, notorious holding under claim of right and with intent to assert such claim as against the true owner.

[Id. at 224, 81 A.2d 137.]
See also Mason v. Home Real Estate Co., 90 N.J. Eq. 455, 458, 108 A. 4 (Ch.1919) (good faith possession, believing title extended to fence, was open, notorious, continuous). Cf. Cooper v. Morris, 48 N.J.L. 607, 7 A. 427 (E. & A. 1886) (denying that only land "marked off by fences or other visible description of its boundary lines" is required for adverse possession).
Case law nationwide shows there is a virtual per se rule that fences constitute open and notorious possession. Lilly v. Palmer, 495 So.2d 522, 528 (Ala.1986) (fence which enclosed disputed strip is evidence of open and notorious possession); Potlatch Corp. v. Richardson, 278 Ark. 498, 647 S.W.2d 438, 438-39 (Ark.1983) (fence not necessary for adverse possession, as long as there is visible and notorious act of ownership conveying knowledge, or presumed knowledge, to true owner); Williams v. Rogier, 611 N.E.2d 189, 195 (Ind.Ct.App.1993) (construction of fence due to mutual mistake on boundary location will not defeat adverse possession); Bank of Mississippi v. Hollingsworth, 609 So.2d 422, 425 (Miss.1992) (fences satisfy open and notorious requirement); Moore v. Dudley, 904 S.W.2d 496, 498 (Mo.Ct.App.1995) (possession not open and notorious where there were no buildings or houses near land, no crops raised, no cattle grazed, no fence put in or taxes paid); Scott v. Rorebeck, 766 S.W.2d 659, 664 (Mo.Ct.App.1989) (property enclosed within fence, used for storage and parking as needed, suffices for open, notorious, continuous possession; actual knowledge of owner not required as long as occupancy is "conspicuous, widely recognized and commonly known"); Snover v. Grabenstein, 106 *1017 N.C.App. 453, 417 S.E.2d 284, 287 (1992) (old wire fence in place over fifty years was open, notorious, continuous); Slak v. Porter, 128 Or.App. 274, 875 P.2d 515, 519 (1994) (construction of fence is classic example of open and notorious use).
Plaintiffs argue, and defendant does not disagree, that the railroad tie and cable fence was generally considered by the community and predecessors in interest to the parties, as the boundary line between the two pieces of land. To the extent there were remnants of an earlier wire mesh fence, they too were considered to establish a boundary, however undefined or invisible in part. In fact, initially Whibco, in 1989, ordered a survey made because of a suspicion that the railroad tie and cable fence was being moved by the Stumps. Although the suspicion appears to have been groundless, the survey made Whibco aware of the fact that the fence was actually located on Whibco's property.
With regard to a mistake by a claimant as a bar to an adverse possession claim:
The more widely accepted view is that an adverse claim, otherwise valid, is not defeated by an initial mistake as to where the claimant's property ends and the neighbor's property begins. Thus where a coterminous landowner holds actual possession of a disputed strip of land under a claim of right openly, exclusively and continuously for the statutory period, believing that he is holding to the true line, the landowner acquires title up to that line, even though the belief as to the correct location originated in a mistaken belief[.]
[7 Powell on Real Property, supra, at § 1013[2], at 91-31-32.]
New Jersey case law at one time accepted a harsher view: a mistake negated the viability of an adverse possession claim. However, with the rejection, in 1969, of "hostile" possession as an element of adverse possession, this can no longer be the case. See Rullis v. Jacobi, 79 N.J.Super. 525, 528, 192 A.2d 186 (Ch.Div.1963) ("occupancy under a mistaken impression about the true location of a boundary line is not `hostile'"); but see Mannillo v. Gorski, supra, 54 N.J. at 386-87, 255 A.2d 258 (discarding the hostility requirement for adverse possession).
Whibco suggests that the old fence, of unknown origin, might have even been constructed by former owners of its property. This argument does not necessarily militate in favor or Whibco. If, in fact, Whibco or a predecessor in title constructed the fence, mistaking the boundary line when it did so, and its error induced the error of the Stumps and their predecessors in title as to the location of the true boundary line, Whibco may be deemed "precluded from disputing the boundary line so fixed." Keilt v. Lozier, 7 N.J. Misc. 642, 644, 146 A. 786 (Sup.Ct.1929).
We note also that the disputed parcel is too large to be considered a minor encroachment. See Mannillo v. Gorski, supra, 54 N.J. at 382, 388, 255 A.2d 258 (involving a fifteen inch encroachment) ("[W]hen the encroachment... is of a small area and the fact of an intrusion is not clearly and self-evidently apparent to the naked eye ... [the] presumption [of adverse occupancy] is fallacious and unjustified."); Maggio v. Pruzansky, supra, 222 N.J.Super. at 573, 537 A.2d 756 (involving an intruding strip slightly more than one foot in width).
We hold, as a matter of law, therefore, that the occupancy depicted herein was not a minor encroachment. We reach this conclusion because of the existence of a true fence and the size of the parcel.
Notwithstanding that the railroad tie and cable fence and the disputed area it separated cannot be considered minor encroachments, the Stumps have not adequately established that their (and their predecessors') occupancy was sufficiently open and notorious for the necessary duration to satisfy that requirement. Their claim is seriously weakened by evidence that when the Cox family first took title to the land, the wire mesh fence was overgrown, indiscernible or non-existent in certain areas. The testimony of Paul Cox, Jr., who was in grammar school at the time his parents purchased the property, was the only evidence on the issue:
[I]t was an old fence, similar to what they had in those days, which was made out of square wire mesh. And it was covered with bushes and things, so I'm notyou know, I just knew it was there.
As to where the fence began, Cox said:

*1018 [T]he old wire fence that was covered with brush was difficult to tell. I couldyou know, I knew there was a fence there ... but I don't know where it [ ] originated and where it terminated.
Manifestly, a fence in the condition described delineates no boundary. So neglected, decrepit, and non-continuous a structure may be adequate to establish that all concerned were under the impression that it signified the approximate location of the property line, but in order to establish dominion over particular propertyso essential to a claim of adverse possessionits perimeter, and the adverse claim thereto, must be more well-defined than was the case here when the partially visible wire mesh fence existed during the period of Cox ownership. Plaintiffs, therefore, have not sustained their burden to prove a clear assertion of dominion during that period as an intact fence would.
The Coxes did not maintain the old fence, but after they installed the replacement railroad tie and cable fence, they maintained that structure and kept it clear of brush. The replacement fence was installed when Paul Cox, Jr. was in the Merchant Marines, between 1967 and 1969. That fence in the condition described met the requirements for boundary definition that a claim for adverse possession must of necessity entail. See Maggio v. Pruzansky, supra, 222 N.J.Super. at 580, 537 A.2d 756. The wire mesh fence clearly did not.
In late 1989 or early 1990, the Stumps received a letter from Whibco revealing the results of the 1989 survey, and demanding that the Stumps remove their encroachments upon Whibco's property. This suit was commenced by the Stumps in 1991, and Whibco's counterclaim was filed in 1993. Since, according to the evidence in the record, the existence of the fence as open and notorious, for purposes of presumptive notice to the true owner, cannot be reliably established until sometime between 1967 and 1969, when the old fence was replaced, the plaintiffs have failed to meet the burden of proving thirty years of open and notorious possession by a preponderance of the evidence.
Thus, we differ with the trial court as to when the period of "open and notorious" possession began. The trial court concluded that the period began in 1981 when plaintiffs' use of the land changed from passive to active, "ris[ing] to the level of acts of dominion." We have concluded that the period must be seen to have begun as early as 1967 but no later than 1969, when the old, indistinct wire mesh fence was replaced with the new railroad tie and cable fence. By all indications from the record, the old wire mesh fence was not only partially disintact or buried, but its points of origin and termination were also unknown. The type of open and notorious dominion over the disputed land, which the law of adverse possession requires, can only be seen to have occurred when the new, more obvious and continuous fence with clear beginning and ending points was installed, and not before. Since, from the proofs, the earliest date that could have occurred was 1967, the Stumps had not satisfied the thirty-year requirement by the time Whibco asserted its ownership of the disputed tract in late 1989 and filed its counterclaim in 1993.
Affirmed.
NOTES
[*] "[I]t is generally agreed that the term `hostile' does not mean that there has to be ill will or malevolence, but the term means only that one in possession of land claims the exclusive right thereto." J.H. Cooper, Annotation, Adverse Possession Involving Ignorance or Mistake as to BoundariesModern Views, 80 A.L.R.2d 1171, § 2, at 1173 (1961).