Worth v. Gonyaw, No. 49-3-06 Oscv (Tomasi, J., Dec. 21, 2011)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT

SUPERIOR COURT
Orleans Unit

CIVIL DIVISION
Dkt No. 49-3-06 Oscv

Thomas J. and Sandra Worth,

     Plaintiffs,

v.

Ronald and Edith Gonyaw,

     Defendants.

**Findings of Fact, Conclusions of Law, and Order**

This matter came before the Court for a trial on August 15 and 22, 2011. Both parties appeared and provided documentary and testimonial evidence. Both were represented by able counsel. Post-trial memoranda were also filed by the parties.

The remaining[1] disputes between the parties focus on the ownership of a narrow strip of land, the location and width of a right-of-way that crosses

---

[1] A number of additional issues divided the parties at the beginning of this case. Those issues have been resolved by agreement or concession. At trial, Plaintiffs conceded two issues. First, they conceded that, through adverse possession, Defendants have acquired ownership of the parcel of land that lies within the lines formed by joining marker M6 (to the southeast), marker M7 (to the northeast), the point roughly midway between markers M7 and M32 (to the northwest), and marker M4 (to the southwest). *See* Exhibits 3 & A. Second, Plaintiffs agreed that that Defendants have ownership of a right-of-way to use a parcel of land that is known as the "short drive" and that allows Defendants direct access to East Echo Lake Road. *See* Exhibits EE & FF (conveying such a right-of-way in Defendants' chain of title); Exhibits 3 and A (showing such a driveway with a dotted line); Exhibit H (picture of

that land, and whether Plaintiffs have acquired a prescriptive easement to use a portion of the right-of-way. Based on the evidence submitted at trial, the Court makes the following Findings of Fact and Conclusions of Law.

## Findings of Fact

1. Both parties own land near Echo Lake in Charleston, Vermont. Plaintiffs have resided in New York and Florida but are frequently at their property on weekends, for some weeks in the summers, and for portions of the winters. Defendants bought land near the lake in 1987 and built a home on that land in 1990. They moved there on a permanent basis in 1998.

2. The land both parties own (and adjacent properties) was previously owned by members of Plaintiff's[2] family. Plaintiff's connection to the land is strong and longstanding. He has been visiting the area for over sixty-five years. He has been going there either for visits or to stay for extended periods his whole life.

---

short drive). For their part, Defendants conceded that they make no claim and renounce any claim to ownership of any of Plaintiffs' lands or to Whitcomb Lane easterly of the line formed between markers M7 and M30. The parties agree, however, that Defendants retain a right-of-way over Whitcomb Lane, east of that same line, to access their land from East Echo Lake Road. Any revised deeds or documents prepared at the end of this case should reflect those concessions.

[2] For ease of reference, the Court will sometimes refer to Plaintiff and Defendant in the singular. In those instances, the references will be to Thomas Worth and Ronald Gonyaw, respectively.

2

3. There is no dispute that from 1943 to 1970, Plaintiff's grandparents, Joel and Ila Whitcomb, owned the land on which the northwesterly portion of Defendant's home is situated. Exhibit JJ & II.

4. The Whitcombs sold the land to their daughter, Erma Worth, in 1970. Exhibit II. Erma Worth was Plaintiff's mother.

5. Erma Worth sold the land to Sharon Morehead in 1979. Exhibit HH. Ms. Morehead was Plaintiff's sister-in-law.

6. Ms. Morehead sold the land to Plaintiffs in 1983. Exhibit GG.

7. Plaintiffs sold the property to William and Louise Hill in 1984. Exhibit FF.

8. The Hills sold the property to Defendants in 1987. Exhibit EE.

9. The property sold to Defendants contained a deeded right-of-way that would allow access to the parcel from East Echo Lake Road. The precise location and width of the right-of-way was not specified in the deed. *Id.* Other property owners to the southwest of the parties' land—currently, the Wagners and the Slasons—also use the right-of-way to access their parcels. Plaintiff has no deeded right to use Whitcomb Lane to the west of marker M6.

10. The parties do not dispute that Whitcomb Lane has functioned as the right-of-way described in the preceding paragraph. *Cf.* Exhibits 3 & A. They do dispute the rightful location and width of the right-of-way to the west of marker M6. Plaintiff asserts that the existing Whitcomb Lane is the

proper location of the right-of-way at that point and that its width should vary between 10 and 16 feet as it progresses to the southwest. Plaintiff concedes that the travelled portion of the road may have moved northeasterly, *i.e*, closer to Defendants' property, over the years. But, Plaintiff believes the Lane has moved no more than approximately six inches in that direction. Defendant agrees that the travelled portion of Whitcomb Lane has moved closer to his property over the years. He claims, though, that it has moved somewhere between six and twelve feet. He would like to move the travelled portion of Whitcomb Lane roughly 2 feet closer to the lake and would like to set the width of the right-of-way at 12 feet.

11. The deeds provide little guidance as to the parameters of the right-of-way. The right-of-way is referred to in Defendants' deed, but it is not set with particularity. *See* Exhibit EE (right-of-way runs across "the existing roadway"). Some earlier deeds describe the right-of-way as being 12 or 16 feet wide.

12. In an attempt to establish the bounds of the right-of-way, both parties and a number of witnesses testified at trial as to the historic location of the travelled portion of Whitcomb Lane. The testimony was not consistent. The Court believes that all of the witnesses testified honestly. The Court ascribes the variances among their testimonies more to faulty memories as to the precise location of a very short sweep of a tire-track road, than to any intentional misrepresentations. Given the Court's ultimate resolution of this

4

matter, it need not fully resolve the differences between the testimony of the witnesses on this point. For purposes of this opinion, the Court finds that, for the fifteen years that preceded the filing of this lawsuit and to a point twenty feet to the southwest of marker M6, the current travelled portion of Whitcomb Lane has remained relatively consistent.

13. Until a survey was completed in or about 2004, the testimony shows that Plaintiffs did not dispute that Defendants' parcel (the "Gonyaw Parcel"): (a) included the land to the north and northeast of a line that runs ninety feet from and roughly parallel to the shoreline of Echo Lake, *i.e.*, from marker M11 to marker M36; and (b) had a northeastern boundary that ran from marker M7 to marker M11. *See also* Exhibit M, at 60. This included a strip of land that contains Whitcomb Lane and that is today bounded approximately by a stone wall and the northerly property line of a parcel owned by the Slason family. *See* Exhibits 3 & A. Specifically, this narrow, rectangular parcel of land (the "Strip") is bounded by markers M4 to M6 to M11 to M36. Ownership of the Strip was the central question at issue in the trial.

14. At trial, Plaintiff conceded that, until a 2004 survey was completed, he believed the Gonyaws owned the Strip. *See also* Exhibit M, at 60. Indeed, while the testimony is disputed, the Court finds that a few months after Defendant purchased the parcel, Plaintiff walked a portion of the land with Defendant and Plaintiff pointed out the rough bounds of the

5

Gonyaw Parcel. The approximate boundaries shown by Plaintiff placed the Strip within the Gonyaws' property.

15. Further, there was earlier litigation relating to this subject between the Gonyaws and the Slason family's predecessors in title—the Shafer-Painter families. In part, that case concerned the lakeside boundary of the Gonyaw Parcel. The parties in that action disputed which of them owned a portion of the Strip. Plaintiff testified in that case in favor of the Gonyaws. He averred that Defendants owned the land under Whitcomb Lane and the grassy portion of the Strip to the lakeside of Whitcomb Lane. *See* Exhibit I, at 110–11. The dispute eventually ended with the establishment of a property line between the Gonyaw property and the now-Slason property that follows markers M36 to M11. In other words, as between the Slasons and the Gonyaws, the Gonyaws own the Strip.

16. Other evidence also supports the conclusion that, until at least 2004, all relevant parties believed Defendants owned the Strip. An affidavit from Plaintiff in the Shafer-Painter litigation indicates his understanding that Whitcomb Lane previously "was owned" by Plaintiff. In context, this plainly shows that Plaintiff believed he no longer owned the land at the time the Affidavit was executed. Exhibit J. Similarly, an affidavit from Erma Worth indicates that she used to own a sixteen foot piece of land under and adjacent to Whitcomb Lane and that she believed it had passed to Ms. Morehead when Erma Worth sold the land to Ms. Morehead in 1970. Exhibit

6

K. The parcel sold to Ms. Morehead is the same parcel that was eventually acquired by the Gonyaws. Exhibit EE.

17. Defendant maintained at trial that he always believed he had purchased and owned the Strip. He testified that the realtor who showed Defendants the property indicated that the Strip was part of the parcel Defendants were purchasing.

18. Defendant also testified at trial that he maintained the Strip. He mowed and maintained the small grassy section adjacent to the stone wall. Defendant was principally responsible for removing snow from Whitcomb Lane but other adjacent owners also assisted with that task. Plaintiff noted that he had seen Defendants pack snow to the northerly side of Whitcomb Lane to protect the stone wall from damage. Defendant made repairs to the roadway as well. Defendant further testified that he mowed and maintained the grassy section between the Slasons' property and Whitcomb Lane. Plaintiff admitted that Defendants had raked the Strip. *See* Exibit LL (depicting raked area). Defendant conceded that Plaintiff had also removed snow from Whitcomb Lane sometimes and had made occasional repairs to Whitcomb Lane. He also noted that Plaintiff had done some mowing within the Strip, but only after the filing of this lawsuit.

19. In addition, Defendant testified that he and his family had consistently exercised control over the Strip. For example, Defendants removed a fence and shrubs that had been erected by the Slasons'

predecessors-in-interest on the land to the lakeside of Whitcomb Lane. *See* Exhibit SS (depicting area where fence and shrubs were located). Plaintiff testified that the Defendants often drove over the grass in that same area. Plaintiff also noted that the Defendants had created a drainage ditch that passed through the Strip. *See* Exhibit 13(b).

20. Plaintiff did not suggest that he had been principally responsible for maintaining Whitcomb Lane and did not contest that the Gonyaws, the Slasons, and the Wagner family had done that work. Plaintiff stated that he did sometimes plow or snow blow the travelled portion of the Lane and had made some repairs to it over the years. He conceded, however, that he is in Florida for a period of time in the winter. Plaintiff also admitted that he had placed some boulders and shrubs on the lake side of Whitcomb Lane approximately four years ago.

21. Plaintiff indicated at trial that he uses a portion of Whitcomb Lane to the southwest of his property as a turnaround area for his vehicles. Plaintiff stated that his parking area is just adjacent to the Slason property. To get out of the parking area, Plaintiff testified that he sometimes backs into Whitcomb Lane before proceeding forward toward East Echo Lake Road. The testimony does not reflect precisely how often Plaintiff has made this maneuver, but Plaintiff testified that he has exited his property in this way since 1984. Defendant testified that he has seen Plaintiff leave Plaintiff's

8

property in this manner.[3]  Plaintiff indicated that he uses roughly thirty feet of Whitcomb Lane to the southwest of marker M6 to perform this turnaround maneuver.  Plaintiff stated that his principal vehicle is 6 feet wide.

22.  A survey conducted in or about 2004 changed Plaintiffs' view as to whether they owned the Strip.  Indeed, trial evidence offered by surveyors and a review of the deeds that correspond to the properties at issue show a different northeasterly boundary for the Gonyaw Parcel than was historically understood by the parties.  To be precise, a deed conveying a triangular piece of land to Plaintiffs in or about 1970 sets the boundary line of what is today Plaintiffs' property further to the northwest than the line formed by markers M6 to M7.  *See* Exhibit 6.  (The triangular parcel is also recognized, without exact description, in Defendants' chain of title.  *See, e.g.,* Exhibit EE.)  The trial testimony of Plaintiff and Plaintiffs' expert, Shane Clark, indicates that such a revised property line would go directly through Defendants' home.  *See* Exhibit 3 & Exhibit A (both depicting the revised property line as a dotted line).  It would also mean that most or all of the Strip remained under the ownership of Plaintiffs.  *See* Exhibit 3 & Exhibit A.

23.  Such a result is inconsistent with the common understanding of Defendants; of the prior owners of the land now owned by the Gonyaws, *see* Exhibit K; and, at least until 2004, of Plaintiff.  It is also inconsistent with

[3] Although Plaintiff stated that he sometimes uses Whitcomb Lane to visit the Wagner family at the end of the Lane, he made no claim at trial to any prescriptive use of the right-of-way to the southwest of marker M6, other than in connection with turning around his vehicles.

9

the deeds in Defendants' chain of title. For example, in 1984, Plaintiffs conveyed the Gonyaw Parcel to the Hills. Exhibit FF. The deed also conveyed a right-of-way. (The same right-of-way was later conveyed by the Hills to the Defendants. Exhibit EE.) The right-of-way is noted to cross the "northwesterly corner" of Plaintiffs' property to give access from the Gonyaw Parcel to East Echo Lake Road. If the northwesterly property line of Plaintiffs' land were as specified in Exhibit 6, the right-of-way described in Exhibits EE and FF would not cross the "northwesterly corner" of Plaintiffs' property. Moreover, that deeded right-of-way would not even reach the Gonyaw Parcel. The right-of-way would end in the middle of Plaintiffs' property.

24. Given the inconsistency between Exhibit 6 on the one hand, and Exhibits EE and FF, and the parties' understandings on the other, Defendants' expert, Carroll Peters, opined that he believed there was a scrivener's error in Exhibit 6. He testified that the deed incorrectly identified the northwesterly boundary of Plaintiffs' lot as being the "western" boundary of an adjacent lot. If, instead, the "eastern" boundary of the adjacent lot is substituted as the reference point, the Plaintiffs' northwesterly boundary line would lay between markers M7 and M11 and would correspond to the historical understandings of the parties described above.

10

## Conclusions of Law

### I.    Ownership of the Strip

The deeds at issue in this case are not models of clarity.  Boundary lines of parcels are sometimes incorporated from other deeds without precise description.  Rights-of-way are sometimes "reserved" and not sold; other rights-of-way are not set with any particularity.  For instance, Defendants have a deeded right-of-way in the general area of what is now called Whitcomb Lane, *see* Exhibit EE, but the proper location of the right-of-way is not defined.

Defendants' principal claim to the Strip is not based on any deed but on adverse possession.[4]  As discussed below, the Court concludes that the Gonyaws have acquired ownership of the relevant portion of the Strip though adverse possession.

Adverse possession requires consistent use of property by claimant over an extended period of time.  "To achieve title through adverse possession, a claimant must demonstrate that possession of the land was

---

[4] As noted in Finding 24, Defendants claimed at trial that there was an error in Exhibit 6 that resulted in a property line running through their home. Defendants suggested that the deed might be reformed to modify the alleged error.  Due to the numerous issues raised by such a request, *see, e.g.*, *Morse v. Murphy*, 157 Vt. 410, 411–12 (1991), the Court asked for post-trial legal arguments from defense counsel as to whether a deed may be reformed or re-written under the circumstances presented in this case.  Defendants submitted no such support and, thus, have abandoned the claim that the deed be re-written.  This may well be because Plaintiffs do not contest that Defendants' northeasterly property line has, through adverse possession, moved to the position sought by Defendants, at least as regards the land formerly in dispute to the north of the line formed by markers M4 and M6.

11

open, notorious, hostile and continuous throughout the statutory period of fifteen years." *N.A.S. Holdings, Inc. v. Pafundi*, 169 Vt. 437, 440 (1999) (citing 12 V.S.A. § 501).

Here, the Court finds all of the elements of adverse possession have been satisfied. There is no question that the Gonyaws have been using the Strip since 1987. The 15 year requirement is met.

Their use has been open and notorious. "Acts of possession are deemed sufficiently open and notorious if they are conducted in a manner which would put a person of ordinary prudence on notice of the claim." *Deyrup v. Schmitt*, 132 Vt. 423, 425 (1974). In this instance, the Gonyaws consistently maintained, mowed, removed snow from, and made repairs to the Strip. While others also did some plowing of Whitcomb Lane (as might be expected with a common right-of-way), and Plaintiff made some repairs, the evidence supports the conclusion that the Gonyaws were the principal caretakers of the Strip and did the mowing.[5]

In addition, when one of the Slasons' predecessors-in-interest erected a fence and planted shrubs in the portion of the Strip closest to the lake, the Gonyaws acted to protect their interest. They removed the fence and the plants, thereby proclaiming their ownership of the parcel. Moreover, Defendants drove on the grassy portion of the Strip and dug a drainage ditch

---

[5] The Court acknowledges that Plaintiff also did some mowing in recent years, but that did not occur until after the 2004 survey and the passage of the prescriptive period.

over a portion of it. As the Court described in *Pafundi*, 169 Vt. at 441, the Gonyaws "unfurled their flag" on the Strip so the world could see they owned it.

Indeed, the Gonyaws' use was consistent with Plaintiff's long-held understanding regarding the ownership of the lot. The evidence provided by a past owner and by Plaintiff himself is that all believed the Strip belonged to Defendants. *See, e.g.,* Exhibit I, at 110–11; Exhibit J; Exhibit K.

Even if both Plaintiff and Defendant were mistaken as to the actual location of the property lines, that fact does not defeat a claim for adverse possession. *See Zuanich v. Quero*, 135 Vt. 322, 325–26 (1977) (property acquired by adverse possession despite "mistaken belief" that property belonged to claimants); *Kendall v. Selvaggio*, 602 N.E.2d 206, 209 (Mass. 1992) ("[P]ermissive use based on a mutual mistake as to the location of a boundary line will not defeat a claim of adverse possession.").

Given their consistent maintenance and use of the Strip over the years, the Gonyaws were in actual possession of the Strip for the required statutory period.[6]

---

[6] Even assuming the Gonyaws' use of the Strip did not constitute actual possession, they still would be entitled to possess the Strip adversely. Given their complete occupation of the portion of the land northerly of the stone wall, they would be able to claim "constructive possession" of the remainder of the land within the Strip. *Pafundi*, 169 Vt. at 441. Based on the understandings of the parties and of a prior owner, and the fact that Plaintiff and the realtor who sold the property to Defendant identified the area in the Strip and the area north of the stone wall to Defendant as being a part of Defendant's property, the Court finds that the Gonyaws held that property

One possible bar to adverse possession in this case is the exclusivity requirement. Adverse possession typically demands that the claimant establish that his possession of the property at issue was "exclusive." *See Schonbek v. Chase*, 2010 VT 91, ¶ 8, available at http://info.libraries.vermont.gov/supct/current/op2009-292.html. In this case, for a period of time, the Gonyaws and the prior owners of the current Slason property disputed the location of their common property line. As noted above, one of those prior owners installed a fence and shrubs, the Gonyaws removed them, and the dispute went to litigation.

The Court finds the disagreement between the Gonyaws and the prior owners of the Slason property does not defeat the adverse possession claim. While that property dispute might be relevant if the Gonyaws were asserting adverse possession against the Slasons, it is insufficient to defeat an adverse possession claim against Plaintiff. For that claim, the relevant question is whether the Gonyaws exercised dominion over the Strip—as regards Plaintiff—for fifteen years. As discussed above, they did.

Case law supports that conclusion. In *Stump v. Whibco*, a New Jersey court held that Stump's adverse possession of the disputed property was not interrupted when a third party occupied the land in question. 715 A.2d 1006, 1011–12 (N.J. Super. Ct. App. Div. 1998). The court reasoned that: "When a

---

"under color of title." *Id.* at 441 n.3 (defining "color of title"). That conclusion allows the Gonyaws to claim adverse possession of the Strip through constructive possession. *Id.*

14

third party, one who is neither the true owner nor the adverse possessor, interferes with possession, it seldom constitutes an interruption of possession." *Id*. (citing 7 *Powell on Real Property* § 1013[2], at 91-26). The Court reviewed a number of adverse possession decisions and noted that the "[t]he critical point seems to be, not that a third, unrelated party has or has not excluded the putative adverse possessor from the land; but that the true owner has not acted in such a manner as to reclaim it." *Id.* As a result, the activities of the third party did not defeat the adverse possession claim. The same is true here. *See also Bentley Family Trust v. Lynx Enterprises, Inc.*, 658 P.2d 761, 766 (Alaska 1983) (adverse claimant's actions in leasing land to third party and excluding others from land when its interest was threatened constituted sufficient acts of ownership).

Likewise, Plaintiff's sporadic visits down Whitcomb Lane and his plowing and repairing efforts on the travelled way are not fatal to Defendants' adverse possession claim. Possession need not be absolutely exclusive to amount to adverse possession. "The purpose of the requirements for adverse possession is to put the true owner on notice of an adverse possessor's claim. Towards this end, the exclusivity and continuity of an adverse possessor's use of a disputed area must only rise to that level that would characterize an average owner's use of similar property." *Tenala, Ltd. v. Fowler*, 921 P.2d 1114, 1119 (Alaska 1996); *see Jarvis v. Gillespie*, 155 Vt. 633, 638–39 (1991) ("The ultimate fact to be proved in an adverse possession

case is that the claimant has acted toward the land in question as would an average owner, taking properly into account the geophysical nature of the land.").

In *Smith v. Hayden*, for example, the Colorado Supreme Court stated that "a mere casual entry for a limited purpose by the record owner is not necessarily sufficient to prove that the use of the property was joint" and, thus, nonexclusive. 772 P.2d 47, 52 (Colo. 1989). There, the record owner occasionally crossed the disputed parcel to obtain access to a separate piece of his property, his children occasionally played there, and he may have stored lumber on the disputed parcel. *Id*. at 53–54. The court held that these occasional uses did not destroy the exclusive possession of the adverse claimants. *See id*. at 54; *see also Pueblo of Santa Ana v. Baca*, 844 F.2d 708, 713 (10th Cir. 1988) ("Interruptions in use of the property must be equivalent in force to the possession to defeat adverse possession. Certainly occasional entries by the title owner are insufficient to interrupt the adverse possession.").

In this case, the evidence shows that throughout the relevant period, Plaintiff believed that Defendants owned the property in question. Plaintiff offered no testimony that his infrequent use of the right-of-way to visit friends or his plowing and repairing efforts during that period were meant, in any way, to assert his ownership over the land. Instead, it appears such activities were merely neighborly efforts to maintain a driveway used by a

16

number of families.  Under such circumstances, and in light of the above case law, the Court finds that Defendants' use and occupation of the Strip was sufficiently exclusive to establish their claim for ownership of the Strip through adverse possession.

## II. Plaintiff's Claimed Prescriptive Easement Over Whitcomb Lane

Based on his prior usage, Plaintiff claims a prescriptive easement to use a portion of Whitcomb Lane to the west of marker M6.  Plaintiff has a driveway next to the Slason property.  Plaintiff asserts that he backs his vehicles into Whitcomb Lane from that driveway before heading toward East Echo Lake Road.  He claims that this conduct gives him a prescriptive right to continue to use Whitcomb Lane as a turnaround for his vehicles.

The elements for obtaining an easement by prescription are similar to those of adverse possession.  *In re Town Highway No. 20 of Town of Georgia*, 2003 VT 76, ¶ 22, 175 Vt. 626 (mem).  "To successfully claim an easement through prescription, there must be open, notorious, continuous and hostile use of a right-of-way for fifteen years."  *Wells v. Rouleau*, 2008 VT 57, ¶ 8, 184 Vt. 536 (mem.).  Unlike adverse possession, a claimant need not establish that his use of the property was exclusive.  *See Schonbek v. Chase*, 2010 VT 91, ¶ 8.

Here, the Court finds that Plaintiff has established a claim to a prescriptive easement.  The Court has no problem concluding that the Plaintiff's use of Whitcomb Lane was adverse, open and hostile.  Plaintiff did

not obtain Defendants' permission to use the Lane. *See Hilliker v. Husband*, 132 Vt. 566, 568 (1974) ("In the absence of permission, the use of an established claim of right firmly establishes the hostility of that use."). Defendant testified that he was aware Plaintiff had used Whitcomb Lane as a turnabout for his vehicles. "A prescriptive claimant's use of a driveway openly in the presence and with knowledge of record owners is sufficient to establish open, notorious and hostile use." *Id.*

Likewise, the evidence shows that Plaintiff has been reversing the direction of his vehicles on Whitcomb Lane since 1984. The fact that Plaintiff's use of Whitcomb Lane was somewhat seasonal does not defeat his claim for a prescriptive easement. *See Wells*, 2008 VT 57, ¶ 20 (neighbor's seasonal use of driveway did not preclude finding of unlimited prescriptive easement to use driveway). Nor did Defendant offer any evidence suggesting that Plaintiff's use of Whitcomb Lane was merely sporadic. *Cf. First Congregational Church v. Manley*, 2008 VT 9, ¶ 17, 183 Vt. 574 (infrequent lawn mowing insufficient to establish adverse possession) (mem.); *Adams Family Properties v. Tomasi*, No. 2009-480 (Vt. Aug. 18, 2010) (unpublished mem.), available at http://vermontjudiciary.org/d-upeo/upeo.aspx (sporadic use insufficient to establish prescriptive easement).

The Court also concludes, however, that the scope and extent of the prescriptive easement is not as broad as claimed by Plaintiff. A prescriptive easement is narrowly defined. *See Flaherty v. Muther*, 17 A.3d 640, 661 (Me.

2011); *Price v. Eastham,* 254 P.3d 1121, 1126 (Alaska 2011) (both citing *Restatement (Third) of Property, Servitudes* § 4.1(1) (2000)). As the Vermont Supreme Court noted in *Dennis v. French*, the extent of a prescriptive easement "is determined by the user, upon which is founded the presumed grant; the right granted being only co-extensive with the right enjoyed." 135 Vt. 77, 80 (1977) (emphasis omitted).

Plaintiff claimed at trial that he uses thirty feet of the Lane to the southwest of marker M6 and, in his post-trial memorandum, seeks a prescriptive easement of fifty feet. Neither distance is credible. Given the Plaintiff's description at trial of how he reverses his vehicles in Whitcomb Lane, the Court believes it more likely that Plaintiff has used no more than a general vehicle length – twenty feet – to accomplish his turnaround. Accordingly, the Court finds that Plaintiffs' prescriptive right to use Whitcomb Lane extends no farther than twenty feet to the west-southwest of marker M6.

The location of the prescriptive easement is the existing Whitcomb Lane. The Court has concluded that, at least as regards the area twenty feet to the west-southwest of marker M6, the travelled portion of Whitcomb Lane has been in essentially the same location fifteen-year period that preceded the filing of this lawsuit. That is the location of the usage that created the prescriptive right. Accordingly, Plaintiffs' prescriptive easement runs along the travelled portion of Whitcomb Lane as it presently exists.

### III.    The Proper Location of Defendants' Right-of-Way

The Court has determined that Defendants now own the Strip and that Plaintiffs have only a limited prescriptive right to use the travelled portion of Whitcomb Lane, as it exists today, for a distance of twenty feet to the west-southwest of marker M6.

The issue of the proper location and width of the right-of-way to the west-southwest of marker M6 is, therefore, either moot or not justiciable as between these parties. Plaintiffs' prescriptive easement is limited to the existing travelled way and is not coextensive with the Defendants' deeded right-of-way. But Defendants are not free to move the travelled portion of Whitcomb Lane that is encumbered by Plaintiffs' prescriptive easement without the agreement of the Plaintiffs. *See Sargent v. Gagne*, 121 Vt. 1, 12 (1958) ("[A] way, once located, cannot be changed thereafter without the mutual consent of the owners of the dominant and servient estates"); *see* also *In re Shantee Point, Inc.*, 174 Vt. 248, 261 (2002) (noting same).[7]

Further, based on the Court's ruling today, Plaintiffs have no cognizable interest in the land beyond the scope of their prescriptive easement. Thus, if there is a need to determine the location and width of the

---

[7] Defendants agreed at trial that, were they to prevail, they would grant Plaintiffs an express easement sufficient to use a triangular piece of land within the Strip to back their vehicles onto what Defendants hoped would be a slightly relocated Whitcomb Lane. Such an express easement may provide Plaintiffs with greater ease and flexibility in reversing their vehicles. Whether such an arrangement would be beneficial to both parties is left to counsel and the parties to discuss in advance of preparing any final documentation in this case.

right-of-way beyond that prescriptive easement, it must be determined in an action where both parties have a legally cognizable interest in the matter.[8]

IV.     **Removal of the Boulders and Shrubs Within the Strip**

Defendants have asked that the Court order Plaintiffs to remove the boulders and shrubs they admittedly placed on the lake side of Whitcomb Lane.  As there is no counterclaim in this case, however, the Court will not order such affirmative relief at this time.  Counsel are encouraged to address this issue as they work together to craft the documentation that will flow from this Order.

V.      **Conclusion**

In light of the foregoing:

1.      The Court finds in favor of Defendants and concludes that they have acquired ownership of the Strip though adverse possession.

2.      The Court finds that Plaintiffs have acquired a prescriptive easement to use Whitcomb Lane, in its existing location, to the point twenty feet to the west-southwest of marker M6.

3.      In addition, based on the agreements or concessions of the parties:  (a) Defendants have acquired ownership of a parcel of land bounded on the southeast by marker M6, on the northeast by marker M7, on the northwest by a point roughly midway between markers M7 and M32, and on

---

[8] The Court understands that there is an agreement between the Defendants, the Slasons, and the Wagners as to the location of the right-of-way to the west-southwest of marker M6.

the southwest by marker M4; (b) Defendants have ownership of a right-of-way to use the "short drive;" (c) Defendants have renounced any claim to ownership of Plaintiffs' lands to the east of the line formed between marker M30 and marker M7; (d) Defendants have renounced any claim to ownership of Whitcomb Lane to the east the line formed between marker M30 and marker M7, except that Defendants retain a right-of-way to travel across Whitcomb Lane to access their property from East Echo Lake Road.

4.      Counsel and parties are directed to prepare the deeds, boundary agreements, or proposed court orders that they believe are appropriate and necessary to effectuate the determinations contained in this Order.

5.      Each side to bear their own costs and attorney's fees.


Dated this ___ day of _____, 2011, in Burlington, Vermont.


_____
Timothy B. Tomasi
Superior Court Judge


Dated this ___ day of _____, 2011, in _____, Vermont.


_____
Robert Goodby
Assistant Judge


_____
Benjamin M. Batchelder
Assistant Judge